UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA
-----------------------------------------------------------------------X

LAUREN ANDERSEN,

                Plaintiff,

      v.

PERRY JOHNSON & ASSOCIATES, INC.,
Jeffrey Hubbard, President, Treasurer, Director & Secretary,

NORTHWELL HEALTH, INC.,
Michael J. Dowling, President & CEO,
Joseph M. Schulman, Senior Vice President,
John Kane, Professor, Zucker School of Medicine,
Greg Radinsky, Chief Corporate Compliance Officer,
Kimberly White, Vice President, Corporate Privacy Officer,
Eric Sandhusen, Compliance Program Director,

                Defendants.

-----------------------------------------------------------------------X

docket # __24 cv 277__

**VERIFIED COMPLAINT**

JURY TRIAL DEMANDED

ORAL ARGUMENT
REQUESTED

FILED
MAR 2 7 2024
IN THIS OFFICE
Clerk U.S. District Court
Greensboro, N.C.
By ____

    I, Plaintiff Lauren Andersen, *pro se*, bring this Complaint against Perry Johnson & Associates, Inc. ("PJ&A"), Northwell Health, Inc. ("Northwell"), and several of their executives, (collectively "Defendants"), and allege as follows:

## TABLE OF CONTENTS

**I. PRELIMINARY STATEMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**II. PARTIES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**III. JURISDICTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**IV. FACTUAL ALLEGATIONS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    My experience . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    The New York State Attorney General's office (NYSAG) and the Governor . . . . . . . . . 23

Previously undisclosed information reveals Northwell's actual malice . . . . . . . . . . . . . 24

How my situation differs from the existing class actions . . . . . . . . . . . . . . . . . . . . . . . . 26

My recent research . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

The NYS Office of Mental Health (OMH) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

The Record Retention is into Overtime . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

The Data Breach was Foreseeable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Value of PII and PHI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Defendants Failed to Properly Protect My Private Information . . . . . . . . . . . . . . . . . . 42

Defendants Failed to Comply with FTC Guidelines . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Defendants' Conduct Violates HIPAA and Evidences Insufficient Data Security . . . . . . 44

Government agencies have been aware of the problems for more than a decade . . . . . . 46

**V: INJURIES AND DAMAGES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

HIPAA fines, and the NCAG . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

"Tier 4" HIPAA violations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

NYS SHIELD Act fines . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55


**VI: CAUSES OF ACTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

First: Negligence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Second: Negligence *per se* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

Third: Negligent hiring, retention and supervision . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

Fourth: Defamation *per se* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

Fifth: Breach of implied contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

Sixth: Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

Seventh: Breach of Fiduciary Duty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

Eighth: Invasion of Privacy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

Ninth: Fraudulent Misrepresentation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

Tenth: Unjust enrichment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

Eleventh: Promissory Estoppel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .85

Twelfth: Deceptive trade practices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .86

Thirteenth: Negligent or Intentional Infliction of Emotional Distress . . . . . . . . . . . . . . 91

Fourteenth: State Mental Hygiene Laws . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .93

Fifteenth: Human Rights Laws . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

Sixteenth: Title III of the Americans with Disabilities Act (ADA) . . . . . . . . . . . . . . . 100

Seventeenth: The Rehabilitation Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .103

Eighteenth: Trafficking Victims Protection Act of 2003 . . . . . . . . . . . . . . . . . . . . .105

Nineteenth: Conspiracy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .108

Twentieth: Civil RICO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

**VII: PRAYER FOR RELIEF** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

**VIII: DEMAND FOR JURY TRIAL** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .115

## I. PRELIMINARY STATEMENT

1.     I, Lauren Andersen, bring this *pro se* action against Defendants for their failure to properly secure and safeguard personally identifiable information ("PII") and protected health information ("PHI") including, but not limited to, my name, date of birth, address, medical record number, hospital account number, admission diagnosis, and date(s) and time(s) of service. On information and belief, the affected data may have also included Social Security numbers, insurance information and clinical information from medical transcription files, such as laboratory

and diagnostic testing results, medications, the name of the treatment facility, and the name of healthcare providers (collectively, "Private Information").

2.    With this action, I seek to hold Defendants responsible for the harms they caused and will continue to cause my family and me, due to the massive and preventable cyberattack that reportedly started on March 27, 2023 and was discovered by Defendant PJ&A on May 2, 2023, by which unauthorized individuals infiltrated PJ&A's inadequately protected network servers and accessed highly sensitive Private Information belonging to Northwell Health patients, which was being kept insufficiently protected (the "Data Breach").[1]

3.    I further seek to hold Defendants responsible for failing to ensure that the Private Information was maintained in a manner consistent with industry standards, the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Privacy Rule (45 CFR, Part 160 and Parts A and E of Part 164), the HIPAA Security Rule (45 CFR Part 160 and Subparts A and C of Part 164), and other relevant Federal and State standards.

4.    To the best of my knowledge, I am the only victim of the Data Breach who had previously sued Northwell Health for similar misconduct, and the only plaintiff who has been victimized in these ways by the company repeatedly.  I informed Northwell (formerly North Shore Long Island Jewish Health System, or NSLIJ) starting in 2011, that my medical records contained errors, deliberately false statements, and privileged information.  Nevertheless, it intentionally spilled that toxic cocktail of documents in public forums – twice, on the Suffolk County Court docket in 2014 and the Nassau County docket in 2017.  Northwell ignored my warnings, and in 2023 it leaked my Private Information again, with a newly revealed conspirator – PJ&A.

---

[1] https://www.beckershospitalreview.com/cybersecurity/northwell-faces-lawsuit-over-data-breach-affecting-3-9-million-people.html

5.      However, there is no claim preclusion problem because this action is based on new facts, and events that occurred after my previous case terminated: my SCOTUS petition for writ of certiorari 22-1042 was denied Oct. 2nd, 2023.

6.      Defendant Northwell is "the largest health system in New York" with $15.6B annual operating revenues.  It consists of more than 85,000 employees, 900+ hospitals, 4200 physicians and 19,000 nurses.  Northwell treats over two million New Yorkers ever year.[2]   On February 28th, it announced its plan to merge with Connecticut's $2.6B Nuvance hospital group. Nearly 13 years after I first reported Northwell's misconduct, its CEO, Michael J. Dowling, trumpets false statements about Northwell's regulatory compliance.  In recent years he has been paid $10m+ a year by Northwell.

7.      Defendant PJ&A provides health information technology solutions, including services such as medical transcription, coding, billing, recording, digital dictation, and court reporting services.  *HIPAA Journal* said that PJ&A is the largest privately-owned provider of transcription services in the US.

8.      On or about May 2, 2023, Defendant PJ&A determined that an unauthorized party had gained access to the PJ&A network between March 27 and May 2, 2023, and, during that time, acquired copies of certain files from PJ&A systems.  PJ&A launched an investigation into the Data Breach and determined that the files involved contained personal health information belonging to patients.

9.      As a result of Defendants' data security failure, unauthorized third parties were able to access and obtain data containing my Private Information from its systems (the "Data Breach").[3]

---

[2] https://www.northwell.edu/about-northwell  (Last visited on January 1, 2024).
[3] https://www.pjats.com/downloads/Notice.pdf

PJ&A has now confirmed to the HHS Office for Civil Rights that 8.9m individuals were affected, making this the largest health data breach of 2023, and one of the largest ever discovered.

10.    In addition to the double whammy effect because this is the second wave of leakage of my Northwell medical records, **an important fact that differentiates me from the vast majority of plaintiffs is that I never gave Northwell written or verbal authorization to hospitalize or treat me.**

11.    I was resident on Long Island, New York, from 2007 to 2022, and was hospitalized involuntarily for mental healthcare treatment by the Defendant Northwell Health at its Zucker Hillside Hospital from June $12^{th} - 30^{th}$, 2011.

12.    During the course of their business operations, Defendants acquired, collected, utilized, and derived a benefit from my Private Information. Therefore, Defendants owed and otherwise assumed statutory, regulatory, contractual, and common law duties and obligations, including to keep my Private Information confidential, safe, secure, and protected from the type of unauthorized access, disclosure, and theft that occurred in the Data Breach.

13.    Despite learning of the Data Breach on or about May 2, 2023, and determining that Private Information was involved in the breach, Defendant PJ&A publicly admitted that it did not start sending out notice letters about the Data Breach to affected individuals like me (the "Notice of Data Breach") until October 31, 2023. The letter I received was dated November 3rd, 2023.

14.    Based on the Cyber Incident Notice (Exhibit 1)[4], and Notice of Data Breach letter (Exhibit 2), Defendant PJ&A admits that my Private Information was unlawfully accessed and exfiltrated by a third party.

---

[4] Exhibits to this complaint have numbers rather than letters to distinguish them from exhibits referred to in *Andersen v. British Airways et al.*, EDNY 22-cv-1594.

15.     The Notice of Data Breach dated November 3, 2023, from Defendant PJ&A and its Cyber Incident Notice informed me that its network had been accessed and my Private Information may have been involved in the Data Breach, which included my name, date of birth, address, medical record number, hospital account number, the names of my healthcare providers, admission diagnosis, and dates and times of service, Social Security numbers, insurance information, and clinical information from medical transcription files, such as laboratory and diagnostic testing results, medications, and the name of the treatment facility.

16.     PJ&A's Notice of Data Breach letter obfuscated the nature of the breach and the threat it posed – refusing to reveal how many people were impacted, how the breach happened, or why it took this Defendant almost six months to begin notifying victims that hackers had gained access to highly private information from my medical records, which based on prior experience included detailed information about my mental and physical health, my personal finances, my ex-husband's healthcare, sexual and relationship matters, my parents and children and information about their private lives too.

17.     Defendants maintained the Private Information in a negligent manner. In particular, the Private Information was maintained on computer systems and networks that were in a condition vulnerable to cyberattack. The mechanism of the Data Breach and potential for improper disclosure of my Private Information was a known risk to Defendants; and, thus, Defendants were on notice that failing to take appropriate protective measures would expose and increase the risk that the Private Information could be compromised and stolen.

18.     When one pays for mental healthcare, one implicitly is also paying for the confidentiality that the psychiatric profession is supposed to guarantee. So, for it to deny that privacy is at best breach of contract, and at worst fraud. And because psychiatry is a regulated medical profession, for it to deny both authenticity and privacy at the same time is doubly

egregious. So, Northwell cannot argue that it "didn't know the gun was loaded", so to speak, with private information, or that a third party was solely responsible for "loading" it. Northwell had been thoroughly warned, it was aware that I had not provided it with an authorization to share my Private Information with PJ&A, and it had no statutory right to do so.

19.     Hackers typically offer Private Information for sale to criminals. My exposed Private Information could be sold repeatedly on the dark web, as is the modus operandi of cybercriminals.

20.     My Private Information was compromised due to Defendants' negligent acts and omissions and their failure to protect the Information. In addition to Defendants' failure to prevent the Data Breach, after discovering the breach, Defendant PJ&A waited six months to report it to affected individuals, which is four months longer than the statutory notice period.

21.     While many details of the Data Breach remain in the exclusive control of Defendants, upon information and belief Defendants breached their duties and obligations by failing, in one or more of the following ways: (a) failing to design, implement, monitor, and maintain reasonable network safeguards against foreseeable threats; (b) failing to design, implement, and maintain reasonable data retention policies; (c) failing to adequately train staff on data security; (d) failing to comply with industry-standard data security practices; (e) failing to warn me of Defendants' inadequate data security practices; (f) failing to encrypt or adequately encrypt the Private Information; (g) failing to recognize or detect that PJ&A's network had been compromised and accessed in a timely manner to mitigate the harm; (h) failing to utilize widely available software able to detect and prevent this type of attack, and (i) otherwise failing to secure the hardware using reasonable and effective data security procedures free of foreseeable vulnerabilities and data security incidents.

22.    As a result of Defendants' unreasonable and inadequate data security practices that resulted in the Data Breach, I am at a current and ongoing risk of identity theft and have suffered actual and concrete injuries and damages, to be discussed.

23.    I seek to remedy these harms because Northwell improperly shared my Private Information with PJ&A, and because it was accessed during the Data Breach. I seek remedies including, but not limited to, compensatory and punitive damages, reimbursement of out-of-pocket costs, future costs of identity theft monitoring, and injunctive relief.

24.    Accordingly, I bring this action against Defendants seeking redress for their unlawful conduct, and asserting claims for: Negligence, Negligence *per se,* Negligent hiring, retention and supervision, Defamation *per se,* Breach of implied contract, Breach of Fiduciary duty, Fraud, Invasion of Privacy, Fraudulent Misrepresentation, Unjust enrichment, Promissory Estoppel, Deceptive trade practices, Negligent or Intentional Infliction of Emotional Distress, State Human Rights Laws, Title III of the ADA, the Rehabilitation Act, Trafficking Victims Protection Act, Conspiracy, and Civil RICO.

25.    There has been a continuing course of tortious conduct by these Defendants and, therefore, the statutes of limitations do not begin to run until the commission of the last wrongful act. My medical records remain on the Defendants' computer systems, they are full of errors and deliberately false statements, I have only been provided with a subset of them, and Defendants continue to show indifference, as Northwell has done for the past 13 years.

## II. PARTIES

26.     I, Lauren Andersen, Plaintiff, am a Citizen of North Carolina, with address at 4214 West Wendover Ave., #1316, Greensboro, NC 27407.[5]

27.     Defendant Perry Johnson & Associates, Inc. is a Nevada Corporation organized under Nevada law in 2005 with its principal place of business located at 1489 W. Warm Springs Rd., Suite 110, Henderson, Nevada 89012. This Defendant is being served through its registered agent, CT Corporation System at 701 S Carson St, Suite 200, Carson City, Nevada 89701.

28.     Defendant Jeffrey Hubbard is President, Treasurer, Director and Secretary of PJ&A, and is being served at the same registered agent.

29.     Defendant Northwell Health Inc. ("Northwell") is being served at its legal affairs department, located at 2000 Marcus Ave., New Hyde Park, NY 11042.

30.     Defendant Michael J. Dowling is President & CEO of Northwell, Joseph M. Schulman is Senior Vice President, Enterprise Data and Chief Information Intelligence, of Northwell, John M. Kane MD is Professor, Zucker School of Medicine (former Chairman of Psychiatry at this school for 12 years, and at Zucker Hillside Hospital for 34 years), Greg Radinsky JD is Senior Vice President and Chief Corporate Compliance Officer, Kimberly White is Vice President, Corporate Compliance Officer, and Eric Sandhusen is Compliance Program Director and Privacy Officer, and all of these individual defendants are being served c/o Northwell's legal affairs department.

---

[5] I have no permanent residential address at present because I have been staying with family while trying to buy a home in a difficult real estate market for the past year. In addition, I am trying to avoid further stalking and harassment, which has been a problem for 13 years (including *inter alia* a death threat). So, I will accept service by email and at the address given or by e-filing. I can provide a temporary address for personal service on request.

### III. JURISDICTION AND VENUE

31.    This Court has subject matter jurisdiction over this action under the Rules of Decision Act, 28 U.S.C. §1652. The amount in controversy exceeds $1 million, exclusive of interest and costs. Thus, minimal diversity exists under 28 U.S.C. §1332(a).

32.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(3).   I reside in the Middle District of North Carolina.  I relocated to from New York to North Carolina in 2022 to be closer to my ten family members who live here, several of whom operate a medical technology business headquartered in Alamance County.  I previously lived in NC, and litigated in the Middle District of North Carolina (Greensboro), in *USA v. H.W. Andersen, Inc.*, et al., 95-cv-00315 (JAB). I was not personally a party to the action but was representing my family's company as CEO, and was in Judge James A. Beaty Jr.'s courtroom every day.  I reestablished my NC residency on December 6th, 2022, after living in the UK and New York.

33.    The Defendants are companies which are incorporated in Nevada and New York. Since their offenses involved electronic transmissions, it is difficult to say where all of "the events or omissions giving rise to the claim occurred or a substantial part of property that is the subject of the action is situated" (28 U.S.C. §1391(b)(2)), without conducting some discovery. It could be Nevada, New York, wherever PJ&A's computer servers are located, or – more likely – some combination of these.

34.    North Carolina's long arm statute, N.C. Gen. Stat. §1-75.4(1)d, is construed "to extend jurisdiction over nonresident defendants to the full extent permitted by the Due Process Clause." *Christian Sci. Bd. of Dirs.*, 259 F.3d at 215 (citing *Century Data Sys., Inc. v. McDonald*, 109 N.C. App. 425, 427, 428 S.E.2d 190, 191 (1993)).  Due process allows a court to exercise general or specific jurisdiction over a defendant; the latter applies here.  The arguments in favor of specific jurisdiction are as follows: first, the New York State Attorney General acknowledged my

NC residency by transferring my complaint to the North Carolina Attorney General.  Second, the Defendants, one of their vendors, and regulatory agencies have served me with correspondence related to this litigation by USPS mail at my NC postal address, meeting the definition of "things of value actually received by the plaintiff in this State from the defendant through a carrier without regard to where delivery to the carrier occurred." N.C.G.S. §1-75.4(5)(e). Third, in *Brown v. Ellis*, 678 S.E. 2d 222 (N.C. 2009), merely phone calls and emails to the plaintiff's spouse in NC were sufficient to use the NC long-arm statute, N.C.G.S. §1-75.4(4)(a), and the Defendants have both emailed and called me in NC.  Fourth, Northwell and PJ&A are both large companies, so they will not be greatly inconvenienced by having to litigate out of state.  These facts are sufficient to establish personal jurisdiction in NC.  In addition, it was apparent from my previous litigation against Northwell that it has a virtually unlimited budget for attorneys' fees, which it deployed to engage in gamesmanship and harassment against me – a vulnerable *pro se* litigant. So, it certainly can afford to put its attorneys on an airplane to Greensboro if necessary, for a court appearance.

## IV. FACTUAL ALLEGATIONS

35.     Defendants are covered entities under the Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. §1320d and 45 C.F.R. Part 160-45 C.F.R. Part 162, and 45 C.F.R. Part 164 (HIPAA)).

36.     PJ&A serves as a vendor to Northwell Health, Inc. and numerous other entities providing, among other services, transcription and dictation services.  In the ordinary course of its business, PJ&A receives Private Information belonging to Northwell's patients and maintains, stores, and utilizes the Private Information entrusted to it by Northwell and Northwell's patients. As a condition of receiving these services, PJ&A requires that its corporate customers entrust it with highly sensitive Private Information.

37.     Medical transcription is the processing of voice reports dictated by physicians and other healthcare professionals into text format. The transcription team of a hospital – or its third-party contractor such as PJ&A – typically receives the voice files with dictation of medical documents by electronic transmission. The voice files are then converted into text, using a combination of speech recognition software and human intervention from medical transcriptionists. The transcribed medical reports are usually created in digital format and submitted to the hospital's Electronic Health Record (EHR) system.

38.     Because of the sensitive nature of the Private Information that PJ&A acquires, maintains, and stores, PJ&A assumed legal and equitable duties and knew or should have known that it was responsible for ensuring the security of my Private Information to protect it from unauthorized disclosure and exfiltration.

39.     As a condition of providing health care services, Northwell requires patients such as me to entrust it with highly sensitive Private Information. Northwell uses PJ&A's transcription and dictation services to convert that information to text. Because of the highly sensitive nature of the Private Information that Northwell acquires, maintains, and shares with PJ&A, Northwell assumed legal and equitable duties and knew or should have known that it was responsible for ensuring the security of my Private Information to prevent unauthorized disclosure and exfiltration.

40.     I relied on Defendants to maintain my Private Information confidential and secure, which they failed to do. Defendant PJ&A discovered on or about May 2, 2023 that its network had been breached via cyberattack.

41.     Following a forensic investigation, Defendant then discovered that unknown individuals – hackers – had accessed, obtained, and exfiltrated the Private Information of more than a million affected individuals. Defendant PJ&A's Notice of Data Breach acknowledges that my information was accessed without authorization. PJ&A further admits that cybercriminals not

only viewed and accessed my Private Information, but also acquired it from Defendant's network,

meaning the Private Information was exfiltrated.


**My experience**

42.   To the best of my knowledge, at the time of the Data Breach, I was the only plaintiff

who had already sued Northwell Health and its various associates – including *inter alia,* my health

insurer UnitedHealth Group (and its subsidiary UnitedHealthcare Community Plan of NY) – for

mishandling my private healthcare information and abusing me in various other unlawful ways.

My experience started with an 18-day unlawful involuntary hospitalization in June 2011, which

was done pursuant to a false arrest at JFK airport and false imprisonment at Northwell's Zucker

Hillside Hospital, **without** probable cause, notice, warrant, charges, legal advice, hearing, requisite

paperwork, or time limit on the detention.

43.   I have sued Northwell before, and it has spilled my Private Information previously.

If this Court wishes to get a fuller understanding of the facts of my prior litigation, I call its

attention to the Amended Complaint (doc. #5) in *Andersen v. British Airways et al.*, EDNY 22-cv-

1594, ¶¶27-331 (hereinafter that Amended Complaint is referred to as "*Andersen v. BA*";  see also

Second Circuit, #22-850, and SCOTUS petition for writ of certiorari 22-1042, denied Oct. 2nd,

2023).  Also please refer to the fact-heavy complaint in my medical malpractice case against

Northwell (*Andersen v. North Shore Long Island Jewish Health System (NSLIJ) et. al,* index no.

602687/2015, Second Amended Complaint, doc. #322, hereinafter referred to as "Nassau case",

¶¶14-207), and the petitions in my two Queens Supreme court Article 78 proceedings (*Andersen*

*v. Sullivan, et al.*, index no. 3252/2019, doc. #1, hereinafter referred to as "*Sullivan*", dismissed,

not e-filed, and *Andersen v. Pheffer,* index no. 717495/2021, doc. #16, referred to as "*Pheffer*",

ongoing, e-filed).  They update the facts from my first case, a 2012 US District Court 42 USC

§1983 action in EDNY (*Andersen v. North Shore Long Island Jewish Health System (NSLIJ) et. al*, index no. 12-CV-1049). I incorporate those sets of facts here by reference. Additionally, my ex-husband sued Northwell in a related matter (*Ritchie v. NSLIJ et. al.*, Suffolk County Supreme Court, index no. 009211/2014). This series of cases is nearing the interminability of *Jarndyce v. Jarndyce*, from Charles Dickens' *Bleak House*.

44.     I am restating and referring to some of the facts from previous cases here, because they help the reader to understand the basis for the current action.

45.     I have encountered devastating discrimination and harassment as a *pro se* litigant. In addition, my access to legal representation has been obstructed by my adversaries. This has resulted in a near-total deprivation of my due process rights. Northwell had a hand in this obstruction by preventing me from meeting with my NYS Mental Hygiene Legal Service attorney while I was hospitalized; so did the NYS Attorney General's office (NYSAG) subsequently, and MHLS itself (see *Andersen v. BA*, amended complaint (doc. #5), pp. 68-73). The NYSAG actually went as far as to try to rob me of standing in *Sullivan* on the basis that I was unrepresented, which was absurd since the respondents in that case had materially contributed to depriving me of legal representation. The City Bar was a defendant in *Andersen v. BA* due to its obstructive stance. The Brooklyn and Nassau bar associations' performances were just as much of a hindrance.

46.     **It is impractical if not ludicrous for a 61-year-old litigant to have to go to law school to get compensation for egregious infractions like Northwell's, let alone simply to get divorced.** I never wanted to be a lawyer, and I still don't. I never wanted a law degree from the University of Myself. I didn't want to be a regulatory agent or law enforcement officer either – any more than I would have wanted to be my own surgeon – but I have had to do those jobs too.

47.     Northwell hospitalized me in June 2011 illegally, against my will, and contrary to law, coerced me to disclose my Private Information, billed me unlawfully to create medical records

that contained my Private Information, mixed in demonstrably false statements, collected money by lying about this to my insurance company, UnitedHealth, and used the laundered money to ensure the loyalty of Northwell's legions of allies in regulatory agencies and the New York judicial system, thereby preventing me from achieving due process of law.

48.     I have never received an explanation for why Northwell victimized me, although it was likely a grotesque overreaction to my being a whistleblower.  It harassed, intimidated, threatened, oppressed, coerced, and injured me, in retaliation for (*inter alia*) my criticism of the company (e.g. *Andersen v. BA*, ¶¶29, 79, 94, 132, 186, 295).  Northwell employed gamesmanship in abundance both in the hospital and in the courtrooms.  For example, while I was hospitalized, I complained to one of the head nurses, Jessyca Berkman, that there was a political animus for my detention.  This so-called healthcare professional replied, "I know, but we're going to pretend that it isn't."  She then delighted in my horror at what she had said.

49.     Northwell's staff brazenly signed authorization forms on my behalf without informing me, including notably a form stating falsely that I had received its Notice of Privacy Practices. I did not receive the forms from Northwell until discovery in 2016 (see *Andersen v. BA*, ¶¶100, 299-301).  This purported charity states in its Notice of Privacy Practices that it permits itself to perform surveillance of all of your phone, fax and internet communications from the hospital, if you are a psych patient – which is an egregious violation of wiretap laws. But it also goes a step further, by confiscating your own phone and other devices so that you are forced to use its monitored wall phones, as if you were in prison.

50.     **This is important: every bit of information Northwell collected from me was the product of illicit surveillance**, which lends new meaning to the term "bughouse".  This predatory company charged me fees to collect my Private Information and transform it into the unlawful medical records that are the subject of this action. So, while the Data Breach occurred

in 2023, it is necessary to think back to 2011, when my Private Information was entered into Northwell's computers and transferred from Northwell to PJ&A. The relevant versions of Northwell's Notice of Privacy Practices and other relevant policies started with the ones that were in place in June 2011.

51.     This is how my medical records that were in the Data Breach were funded: Northwell falsified a purported "financial agreement" in June 2011 that committed me to pay for an unlimited amount of its alleged services, by signing the form on my behalf without my knowledge, and another one requiring my health insurance company UnitedHealth to pay it for Northwell's services, although I did not receive these documents until six years later (id., ¶¶30, 98 and Exhibit A). There is no statute of which I am aware that would have permitted Northwell to forge such an authorization behind my back. Northwell's fees of $3700/day were usurious – more than twice the average hospital day rate in New York. This was profusely fraudulent and amounted to bail money, since I had been falsely arrested and imprisoned. UnitedHealth laundered money for Northwell (id., ¶¶96-105), which it used to pay Northwell and PJ&A for the creation in 2011 of the medical records that were later leaked in the Data Breach of 2023.

52.     If Northwell executives had listened to me back in 2011 when I first complained, or in 2014 when I complained that they spattered my Private Information on the Suffolk court docket, or even in 2017 when I complained that they spilled even more of my Private Information onto the Nassau docket, the 3.9m-patient breach would not have happened. But they turned a blind eye, and the class action cases that have been filed against Northwell and PJ&A are likely to be very expensive for the companies. In 2023, the Defendants spilled my data again – this time "accidentally" – after failing to remove my information from their computer servers. (Naturally, I have doubts that this was truly accidental, due to the history.)

53.    During the period 2018 – 2021, I was a victim of identity theft, likely as a result of Northwell having published my Private Information on the court dockets. That exposure has caused damage to my credit ratings and my banking relationships. For example, I discovered that an individual whom I did not know had applied for a loan using my credit. I had to take out a new loan at considerable expense and hassle just to rebuild my credit rating.

54.    The class action cases now number over thirty, and have been filed in New York, Nevada and Michigan courts. They are quite similar in fact pattern and causes of action. Some of them include other PJ&A clients, such as Cook County Health, in Chicago.

55.    I have not been self-represented by choice in my litigation, but only out of desperation. I was successful in obtaining a litigation financing offer from a top-five litigation finance firm but have not been able to find a suitable attorney, which is an unnatural situation that cannot be explained by supply and demand. It evidences obstruction *(Andersen v. BA, ¶204 et. seq.)* The visible sources of the obstruction of justice have included lawyers, bar associations, regulatory and law enforcement agencies, politicians, and even court clerks.

56.    *Andersen v. BA* was dismissed as "frivolous" by Judge Gary Brown of the Eastern District of New York, a district which geographically overlaps Northwell's power base on Long Island. Judge Brown's sideshow is literally doing magic tricks on YouTube and his own website. His reaction to my case was the judicial equivalent of "cancel culture". The Decision started with "ORDER DISMISSING CASE AS FRIVOLOUS" – in all caps, screaming like a headline on a tabloid newspaper. But no discussion followed of how my case met the definition of frivolous. Judge Brown erred by making a credibility determination in dismissing my complaint without first making any factual inquiry into the complaint's allegations. It was as defamatory as calling me a fribble, or falsely accusing me of having a loathsome disease, in the same way that Northwell labeled me with a bogus "bipolar disorder" diagnosis. Judge Brown (a) complained about the

length of the complaint without granting me leave to replead, which would be the usual protocol with a *pro se* litigant, (b) wrongly accused me of exceeding SOLs, (c) incorrectly stated that there was a claim preclusion problem, (d) incorrectly stated that summonses had not been issued, and (e) referred the case to conflicted Magistrate Arlene Lindsay, although there was no Report & Recommendation ever filed.  In addition, the EDNY clerks terminated the filing of my complaint before I had even finished entering the exhibits into the e-filing system, so the Decision was made based on a partial complaint. This was severe information-chilling.

57.    NB: in previous litigation, I was criticized for not pleading with adequate specificity, so in *Andersen v. BA* I made an extra effort to be thorough.  Judge Brown accused me of prolix, although my complaint was similar in length to my previous one in EDNY.  Apparently, it is difficult for a *pro se* litigant to strike the right balance.

58.    Senate Majority Leader Chuck Schumer (Democrat) – Northwell's biggest Washington ally – recommended Magistrate Brown for promotion to the bench at EDNY (see *Andersen v. BA,* 2nd Circuit #22-850, doc. #109, appendix 6).  Judge Brown felt obligated to Sen. Schumer for recommending him, so he thanked his mentor by dismissing my case with barely a mention.  Many Northwell-tainted dollars have landed in Sen. Schumer's campaign coffers, and both he and Senator Kirsten Gillibrand have helped raise over a billion dollars in Federal funds for Northwell.  This exemplified the cronyism and politically-motivated mischief that has repeatedly short-circuited my due process rights.  The 3.9m Data Breach victims have Judge Brown and Sen. Schumer to thank for their despair… and the Second Circuit, which simply rubber-stamped Judge Brown's abuse of discretion.  Although I was suing a prominent Democrat company, the Second Circuit assigned me exclusively Democrat judges – six of them.  SCOTUS then declined to hear my Petition for a Writ of Certiorari, as it does with more than 97% of such petitions.  I had had to

condense my complex case down one issue for SCOTUS due to the top court's restrictive page limit.

59.     In addition to Judge Brown and the Second Circuit, the New York governor, the NYS Attorney General, and scores of other decision-makers (politicians, regulators, law enforcement, judges, and lawyers) treated me like Chicken Little, the character from the children's story who was shown disdain by other barnyard animals when she shouted that the sky was falling. The recent Northwell-PJ&A Data Breach demonstrates that my warnings about the inadequate data security at Northwell and its conspirators over the several preceding years were indeed timely and relevant, and the sky has fallen. Anyone who doubted the legitimacy of my claims in *Andersen v. BA* should find that their misgivings disappear after reading the instant case. It is anything but frivolous.

60.     Due to the political conflicts of interest in EDNY and the Second Circuit, I was never going to receive fair treatment there. I have nightmares about having to deal with that leftward-tilted corporate-sponsored playing field again.

61.     The emotional and financial cost of reparations from the 2023 Data Breach will be huge. These leaks of sensitive information simply cannot be undone, and the victims' only remedies are to change their account and ID numbers, freeze their credit, pray that their information is not discovered by identity thieves and used to harm victims, pay for an identity theft protection service such as LifeLock for the rest of their lives, and/or – in a worst-case scenario – change their identities. However, these are "Band-aid" retroactive solutions, being applied to a vast systemic problem in which breaches occur but are not reported, and – even worse – breach reports are deliberately ignored, as mine were.

62.     Prior to filing *Andersen v. BA*, I discovered that Northwell's lawyers had deliberately placed more than twenty additional plaintiffs' medical records full of confidential

information such as Social Security numbers on New York court dockets too (id., ¶134 et. seq.).  I coined the term "docket doxing" to describe this malicious, unlawful practice.

63.    As a requisite to receiving involuntary medical services from Northwell, I was coerced into providing my Private Information to its staff.  In fact, the hospital staff threatened to injure me if I did not respond to their demands for information, and, to prove this, they actually did assault and batter me on two occasions (e.g. id., ¶408).  Although the services were provided against my will as part of an involuntary hospitalization under New York Mental Hygiene Law (NYMHL) §9.39, I nevertheless assumed at the time that the information would be safeguarded according to the company's internal policies, as well as State and Federal law.  This was a foolish assumption, but one that was based on my family's prior 60-year-long peaceful relationship with Northwell physicians and hospitals.  While I was hospitalized, I observed Northwell hospital staff – both doctors and nurses – entering information about me into their computers.

64.    Northwell staff asked me to sign an authorization at its Emergency Room on June 12th, 2011, but I refused because I did not need to be hospitalized, and I did not meet the criteria for involuntary hospitalization as stated in NYMHL §9.39.  **By sending my Private Information to a third party (PJ&A) to be transcribed, without a written authorization, Northwell violated not only its own policies, and the standards of medical ethics, but also the law (NYMHL Articles 9 and 33, and the HIPAA Privacy Rule).**  (NB: It was not necessary for the company's actions to have been intentionally malicious to have committed these violations.  However, given Northwell's other transparently vindictive conduct toward me, it is possible that the PJ&A spill of my data was also intentional, which the discovery process may reveal.)  Had I known that Defendants failed to implement systems to protect my Private Information, I would not have provided that information to Northwell.

65.     This was not some run-of-the-mill, trip-and-fall-into-the-bughouse situation. My occupation is as Founder and Chairperson of a medical technology company in the UK (id., ¶33). I am a highly educated individual, and – like most entrepreneurs – I am not a snowflake. I am a 61-year-old mother of two, with no prior history of violence, arrest, conviction, involuntary hospitalization, addiction, public demonstration, or problems in airports or hospitals. I was not litigious. I was an experienced international traveler and had taken many transatlantic flights, without incident – including on BA. I had never been refused passage on any form of public transportation before, or previously been refused entry to the UK (or any other country), and have not had any such problems since then. I was enrolled in the Iris Recognition Immigration System (IRIS), which was an initiative by the British government from 2004 to 2013, to provide automated clearance through UK immigration for certain frequent travelers (id., ¶28). I had previously traveled in and out of the UK without a passport under this program. The real reason British Airways caused me trouble was because I suggested that we call the media to the scene to discuss the matter; I thought it might be of interest to other travelers. This convinced BA to do some illegal damage limitation, and it called the Port Authority Police to have me arrested.

66.     For Northwell to have leaked my Private Information with such deliberate indifference was a violation of my rights under the Americans with Disabilities Act (ADA) and Rehabilitation Act, which is echoed in NYMHL Articles 9 and 33. This was discussed in my previous cases. My disabilities are not allegations conveniently concocted for a lawsuit; they are facts which have been well established over 25 years. I have suffered from depression since the late 1990s, had my entire colon removed in 2005 due to a precancerous condition, and had major spine surgery in 2009. My status as disabled has been professionally validated.

**The New York State Attorney General's office (NYSAG) and the Governor**

67.     It is apparent that I have exhausted the administrative complaint process in New York State.  The New York State Attorney General's office (NYSAG) not only showed me deliberate indifference but was also rude and obstructive when I reported Northwell's previous breach to it in 2021 (id., ¶¶199-205, 215, 328, and Exhibit H).  Among other astonishing statements, the official who spoke with me on the phone – who called himself simply "Alex" – said it was unimportant that the doxed plaintiffs' Social Security numbers were leaked because in his view nobody uses Social Security numbers anymore. However, after the PJ&A breach, the NYSAG hypocritically press-released on November 28, 2023, "Attorney General James advises affected New Yorkers to protect themselves and their information from theft and impersonation" … "Identity theft is a serious issue, and my office will continue to take action to keep New Yorkers safe." But Ms. James had been cautioned before, so she has no excuse for her failure to take action to prevent the PJ&A breach from happening.  Ms. James could have prosecuted Northwell under Executive Law §63(12), the same law she used to prosecute Donald Trump, but of course she wasn't going to use that law against her own political sponsors.

68.     Every rock I turned over in my investigation had another Pandora's Box of corruption underneath it, and Alex was but one example.  By showing deliberate indifference to my complaint, the NYSAG not only obstructed my attempts at seeing justice served, but also prevented millions of other people from learning how criminal enterprises such as Northwell operate, which would have enabled them to take steps to protect themselves.

69.    In one of the myriad examples of selective prosecution by the NYSAG, it recently prosecuted the Fulton Commons Care Center nursing home[6] but has declined to prosecute Northwell.

70.    I also wrote to NY Governor Kathy Hochul on December 1st, 2023, about the breach, but received no response. I had written to the NY Executive Chamber previously in 2016 and 2021.  In reply on September 1st, 2021, it pretended that the Chamber had no memory of my initial complaint,  However, it had sent me (in August 2016) copies of my own correspondence to former Governor Andrew Cuomo that I had sent over a period of three years, indicating that there had either been no action, or that whatever action that had taken place was being covered up. However, a formal agreement dated January 26th, 2024, between the Chamber and USDOJ, said Governor Cuomo subjected at least 13 female employees "to a sexually hostile work environment" and retaliated against four who complained.   So, clearly NY State knows the definitions of retaliation and a hostile environment, and should have recognized those violations when it read them in my complaints.

71.    Hackers do not typically discriminate against their victims based on political affiliation, so this is a bipartisan issue… but one would never know that given the way the NYSAG and the Governor treated me.

**Previously undisclosed information reveals Northwell's actual malice**

72.    At the time of my Northwell hospitalization in 2011, my younger son was only seven years old.  The day before Northwell detained and tortured me, I had left my home with

---

[6] https://www.newsday.com/long-island/nassau/letitia-james-fulton-commons-care-center-ubfjxmxr

nothing but my little boy and a suitcase, because I could no longer tolerate the egregious behavior that I had been enduring from my ex-husband in my own home.

73.    The Talmudic rabbis (Yevamot 79a) considered compassion to be one of the three distinguishing marks of the Jewish people.  In Jewish teaching, compassion is among the highest of virtues, and its opposite, cruelty, is among the worst of vices. But Northwell's Jewish founders and leaders apparently failed to get the memo.

74.    Northwell stole my voice for 13 years, by taking advantage of my maternal and Christian instincts to protect my children from damaging information.  I can now reveal the previously undisclosed facts that precipitated my divorce, because my younger son is 20 years old. When he became an adult, I explained to him what I am going to reveal about his stepfather, James Ritchie.  I am stating this because it supports my argument about Northwell's appallingly bad judgment, negligence and actual malice, and it also shows that when the company unlawfully hospitalized me in June 2011, my behavior was within the range of normal for a woman in the midst of a traumatic divorce involving domestic abuse.  Depression, PTSD, and anxiety are typical symptoms in such victims, along with feelings of anger, confusion and shame.

75.    As an aside, my cousin was mugged twice on the streets of New York City. The first time, she was so shocked that she gave the thief her handbag immediately. The second time she was ambushed, she emptied the entire contents of her handbag onto the sidewalk, sobbing, and shouted at the thief, "there it is – take it!"  (I will reveal later what happened to my cousin after that.)  I am now dumping my baggage on the pavement, in protest – see Affidavit, Exhibit 3.  To summarize: shortly before I was hospitalized by Northwell, I discovered that my ostensibly straight husband of six years was in reality a deeply closeted bisexual, who was obsessed with gay BDSM porn, which I discovered with horror that he viewed in the presence of my 7-year-old. Mr. Ritchie forged my signature on a $10k bank transfer, and engaged in vice, among other illegal conduct

(see id.).  He didn't like my objections to his behavior, so he became hostile and violent towards me, and as a result, I left the family home with my son.

76.    The American Psychiatric Association cautions to "avoid pathologizing survivors". However, Northwell did not follow any of the trauma-informed best practices for dealing with me as a domestic abuse survivor.  In depositions, staff were unable to explain how their decision to detain me for 18 days complied with the law, because it didn't.  But Northwell did not consider that anyone who disagreed with its politics or heavy-handed treatment decisions deserved fairness. Clearly, Northwell does not treat all of its patients so abysmally, otherwise the company would be out of business; this was discriminatory cruelty.

77.    **It is apparent that Northwell and its myriad cronies – in the private sector and the groupthink of officialdoms – tried to silence me because they knew how tarnished their reputations would appear when the full extent to which they had locked up the wrong person became obvious.**  Northwell deliberately manipulated its image of me portrayed in its medical records, omitting or downplaying the effects of domestic abuse.  Northwell's malicious intent was to make me appear to be the architect of my own misery, to retroactively justify its lucrative but unlawful decision to detain me for 18 days.   And its staff unnecessarily put enough salacious material in the records to make them pornographic, which placed my son at risk of exposure to damaging information.  So, by sending those records to PJ&A and other third parties, Northwell not only violated my privacy and defamed me, but also published pornography.

**How my situation differs from the existing class actions**

78.    It should be apparent by this point that I am not an ordinary opt-out plaintiff because I did not sign an authorization for treatment or release of my Private Information, and because in my case there was other related misconduct by the Defendants that does not apply to the class

action plaintiffs. I spoke and corresponded with a few of the class action attorneys in New York and Nevada. However, my situation differs enough from the majority of the Data Breach plaintiffs who are currently suing Northwell and PJ&A that it would have been inappropriate for me to join one of those cases as a plaintiff. These attorneys either stopped corresponding with me when they realized that I had special circumstances, or demanded that I sign a retainer agreement before they would even look at my paperwork.

79.    Since law enforcement does not appear to have gotten involved to any significant extent yet, I have had to laboriously do my own fact development for this complaint. My fact pattern is distinguished from most other Data Breach plaintiffs for ten reasons:

(a) Northwell doxed me previously, as discussed in the foregoing, and I have previously sued the company. In the discovery process in *Andersen v. North Shore Long Island Jewish Health System (NSLIJ) et. al.,* Supreme Court of Nassau, index #602687/2015, Northwell produced hundreds of pages of medical records. The records described my experiences of being incarcerated, stripped, drugged, assaulted, battered, and trafficked at Northwell in June 2011, including adult material that Northwell improperly created and displayed to general audiences on the permanent public court dockets. In November 2023, learned that Northwell illegally shared the records with PJ&A, which spilled them again.

(b) I was hospitalized involuntarily as a mental healthcare patient, which entitles me to greater privacy protection under the law than medical patients (NYMHL Articles 9 and 33). Like most involuntary patients, I was deeply offended about being hospitalized against my will. The shame associated with that experience and the excessively private content of the records that immortalized it have devastated me. My car was towed from JFK and impounded by Northwell's conspirator, the Port Authority of NY. When I was admitted to the hospital, I refused to sign any paperwork stating that I agreed for Northwell to perform

any treatments on me or send my Private Information to third parties. My iPhone, iPad, and Macbook laptop were confiscated, preventing me from complaining about this mistreatment. Northwell impounded my keys, wallet and passport to prevent me from going anywhere. I was involuntarily drugged, which sedated me, making it difficult for me to find a way to be discharged. It was in that compromised, numbed, gagged state that I was coerced to give my Private Information to the Defendants, from which the medical records were created. This is not the usual process for all Northwell patients, who tend to be allowed autonomy.

(c) My Northwell medical records contained repetitive, materially false information, which is a situation that none of the class action cases have reported. This entitles me to use defamation as a cause of action. The false statements included for example a bogus diagnosis, and false allegations about my behavior that made me appear to be mentally incompetent. In addition to being materially false, portions of the records had been created by doctors who were unlicensed or unregistered, some for many years (id., ¶¶135, 243, 260). The records were either unsigned or had unidentified signatories. None of the dozens of signatures on the medical records that Northwell produced in discovery were notarized or authenticated, and most of them were completely unidentified and/or illegible scribbles (e.g. see examples in *Andersen v. BA*'s Exhibit A). The records were also improperly served. A psychiatrist casually sliding across the table an ostensibly official but non-notarized court document that deprives the patient of his liberty is palpably improper service of process, but that is how Northwell shrinks "served" papers on me. However, their attorneys inappropriately submitted these falsified documents to the courts as if they were authentic and official (id., ¶289).

(d) I am disabled. This entitles me to protection under the Americans with Disabilities Act (ADA) and State human rights laws.

(e) The Defendants improperly retained my records on their computers beyond the statutory expiration date, *supra*. This unnecessarily put me at greater risk of being hacked.

(f) The Defendants' misconduct adversely affected others in my family, including notably my parents and children.

(g) The Defendants gave me the runaround about providing privileged records to me; key records have been withheld for many years, and continue to be suppressed.

(h) Northwell's motives were transparently retaliatory and motivated by various discriminatory biases including (*inter alia*) gender, age, race, religion, citizenship, disability, genetics, political affiliation, marital and parental status, socioeconomic status, body habitus, and victimhood (id., see ¶¶30, 70, 80, 83, 271, 295, 342, 354, 381-397, 400, 403-409, 452, and Nassau case, ¶¶4, 86, 100, 126, 199, 227, 290-291).

(i) I reported Northwell's misconduct to several law enforcement and regulatory authorities, but did not receive any significant assistance. I have been "cancelled" by several politically biased NY State courts, so I do not see any other possible avenue of relief except Federal court.

(j) I have quantifiable, actual losses and a large collection of evidence of the Defendants' crimes. Most of the 2023 Data Breach victims have only the letters they received from PJ&A, and may never experience any adverse effects from the breach.

80.    For these reasons, I should not be forced into one of the existing class action cases. I have several additional individual Defendants, and supplementary causes of action that the class action cases do not have. After I have endured vastly more litigation expenses and sacrificed time, it would be offensive for me to receive a typical paltry class action payout.

81.     However, my special characteristics could apply to other Data Breach victims who had similar experiences to mine: e.g. who suffer from a disability, whose records were retained beyond the expiration date or withheld, whose family members were adversely affected by the breach, who were involuntarily hospitalized without signing an authorization form (usually as mental healthcare patients, but likely some emergency patients too), who had complained about the Defendants, been doxed previously or previously sued them (indicating the possibility of a retaliatory animus), who found materially false or excessively private information in their records and who may also be Christian parents, who have evidence that they are victims of the Defendants' bias-motivated retaliation, and/or who reported the abuse to regulatory authorities but were ignored.

82.     These patients are an important subset of the total victim pool, and their claims are worth more than the average plaintiff's. Many of them are vulnerable, particularly the involuntary and/or disabled patients, minors, the elderly, the terminally or severely ill, or institutionalized patients. Those who may not have had the mental or financial resources, or English language skills to find an attorney – or even the skills to do research about their rights – may deserve some extra support. As I discovered, they are unlikely to receive the patience and help they need from the existing class action firms. For example, visually impaired plaintiffs, such as my mother, might need to have their documents provided in large type so that they can read them. Plaintiffs such as my father, who has significant visual and hearing disabilities as well as short-term memory issues, need extra support and reminders. Elderly victims are less likely to be able to cope with electronic medical records and court documents than other patients. Like my nonagenarian parents, they might not fully understand why they are at risk of identity theft due to the Data Breach, or even to comprehend the potential implications of having their identities stolen. I tried to explain to my parents that it is as if PJ&A left their wallets in the street for anyone to take, and there is no way

they can undo this. If a thief hasn't used his victim's information fraudulently yet, that only means it is a disaster waiting to happen.

83.    Additionally, some patients whose records were leaked may not have received Notices from PJ&A, because the company is using the addresses it has on record which are likely in many cases to be outdated. The Notices that my parents and I received were redirected to us from an old New York mailing address, so the mail was delayed in reaching us. Other patients might not have had postal forwarding in place, but they may have equivalent rights to compensation. Like my elder son Cameron who lives in Germany, some patients might now be resident overseas. USPS postal forwarding expires after twelve months, but a patient might have been treated a decade ago and his records could still be on the Defendants' networks.

84.    In another example, heirs of deceased patients deserve some extra help to determine eligibility for compensation, and with the supplementary paperwork required. (NB: A patient's HIPAA privacy rights do not expire at death; they remain intact for 50 years afterward.)

85.    It will require some effort, and complete records from the Defendants, to locate and identify patients with special circumstances who might need assistance, to create a database of these individuals, and to categorize this group by their individual circumstances. Court clerks undoubtedly do not have the time to do this.

86.    It is my understanding that I cannot convert this case to a class action without an attorney, which prejudices the many victims who have special circumstances. I discovered that the existing class action lawyers are unwilling to acknowledge that any plaintiffs with special circumstances exist. Their business model is to collect as many plaintiffs as possible, and lump them all together with zero differentiation. They try to minimize client interaction, to boost their margins. There may be volunteers who would be willing to provide support to plaintiffs with special circumstances if a for-profit law firm is unwilling to do all of it. I do not have any staff,

and I have insufficient income to allow me to spend much time on charity work. However, these victims deserve to have a representative to ask the Defendants some questions, such as the thorny question of why Northwell failed to make necessary changes after I sued it the first time and it had learned what its problems were.

87.    The Defendants have not provided any statistics about the Data Breach victims. However, according to Pew Research, there are about 42.5 million Americans with disabilities, making up 13% of the civilian noninstitutionalized population. Assuming disabled people account for a similar proportion of Northwell patients, about 507,000 of the 3.9m Data Breach victims are likely to be disabled.

88.    Northwell says it is "the largest regional provider of inpatient behavioral health services – we currently have over 550 behavioral health beds in operation and annually provide over 450,000 visits".[7] The statistics on the percentage of involuntary psychiatric admissions cited in scientific literature vary widely for the US, from 26-51%. So, of those 450,000 visits, at least 117,000 are likely to have been involuntary. If records were retained on the Defendants' computer systems for ten years, the number of Data Breach victims who were involuntary psych patients could be 1.17m, assuming that **all** involuntary patients' records were breached (NB: Defendants have not released the percentage of total patients who were affected by the Data Breach). There is likely to be some overlap between this number and the disabled patients, but I am unable to quantify it at this stage. So, I will estimate 1.17m either disabled or involuntary Data Breach victims, which is nearly a third of the total victim pool as it is currently approximated at 3.9m. The accuracy of the numbers could be improved in discovery, and it would be helpful to identify

---

[7] https://www.longislandpress.com/2022/08/31/syosset-hospital-psychiatric-unit/#:~:text="Northwell%20is%20the%20largest%20regional,use%20disorders%2C"%20he%20added

these people with a view toward helping them obtain compensation since it is unlikely that the existing class action lawyers will do so.

89.    Two or more of my family members will file FRCP Rule 20(a) motions to join as plaintiffs, and I ask that this Court give them time to do so by refraining from making a decision as lightning-fast as Judge Gary Brown's was. My parents are 90- and 92-year-old, disabled, retired physicians. No family could have been more loyal to Northwell than ours was, prior to June 2011. My mother, Shirley R. Andersen MD, is an Internist who was affiliated with a Northwell hospital – Glen Cove – for over 40 years and referred dozens of her patients to Northwell. My father, Harold W. Andersen MD, is a General Surgeon who was also affiliated with Glen Cove. Northwell has thanked my parents for their support of its business – value in the millions of dollars – by relentlessly abusing their daughter for 13 years.

90.    However, it would be impractical for a large number of plaintiffs to have to join this case *pro se* under FRCP Rule 20(a); we would need a trustworthy attorney. Furthermore, such mass joinder could prejudice me by causing undue delay. And this would assume that such plaintiffs were even aware of the opportunity and conscious that they are entitled to special compensation, which most victims likely would not be. Nevertheless, it would be straightforward for them to prove that they are worthy of consideration as plaintiffs if they have a PJ&A Notice of Data Breach, matching identification, and some documentation of their special circumstances (*inter alia*, proof of disability, or medical records showing involuntary hospitalization).

91.    I ask the Court not to allow any Rule 20(a) plaintiffs other than my family to join this case unless we have an attorney. I would appreciate a conference to discuss this. Screening of potential plaintiffs to determine authenticity and eligibility would be necessary. I know this because I received calls from several pranksters posing as former patients, pursuant to my 2014 radio campaign, including a few who sounded dangerously insane. I only want to help genuine

victims, and I do not want to donate the fruits of my 13 years of labor to violent individuals. In order to do plaintiff evaluations, HIPAA release forms, medical records and other paperwork would be necessary. This would be a difficult administrative burden without a law firm. It will likely be necessary to bifurcate the case due to the diverging fact patterns.

## My recent research

92. There is no daylight between the two companies, Northwell and PJ&A. The purported boundary between the two corporate entities is an illusion, which is a recurring theme among organizations involved in my cases. I called PJ&A's Data Breach hotline on January 2nd. Despite the detailed wording of the company's Notice of Data Breach, a representative who identified herself as "Sarah" told me she could not give me any information about which of the specific details of my Private Information had been leaked. Instead, she gave me Northwell's hotline number and encouraged me to call the company. She refused to give me the name of her supervisor, or any information about the data security measures – if any – that may have been in place at the time of the breach. This was information-chilling and obstruction.

93. I next called Northwell's Data Breach hotline. A representative who identified himself as "Uduak" confirmed that my Private Information which was subject to the Data Breach included the records of my Northwell mental health hospitalization in June 2011. He said my records also included a medical outpatient visit in March 2012. Although PJ&A's letter had stated that the leaked information likely included Social Security numbers, Uduak alleged that these numbers had not been breached. I asked for more information, since Northwell had publicly leaked my Social Security number in 2014..

94. Eric Sandhusen, Compliance Program Director & Privacy Officer, from Northwell's Corporate Compliance department called me on January 8th to tell me that the breach

only pertained to records from 2013 to 2023, which conflicted with the information that I had received from Uduak. I then asked him why I received a Data Breach Notice from PJ&A, since I was hospitalized in 2011. Mr. Sandhusen said he would investigate and call me. When he called back, he said that the 2011 and 2012 records were indeed included in the breach. When I eventually received the 2012 "records", they were blank except for a header, and Mr. Sandhusen alleged that I had been a "no-show" for the 2012 appointment. This didn't make any sense, since he and Uduak had already told me the records were in the Data Breach, and I did not recall missing an appointment. So perhaps he meant the records themselves would be a no-show. Either this was an attempted cover-up, or there is something wrong with Northwell's search protocols, but either situation justifies some discovery. To the best of my knowledge, none of the class action plaintiffs have reported any difficulty in obtaining their medical records from Northwell.

95.    There is enough inconsistency in the statements from the two companies to justify some discovery. If Northwell still had my 2011 records, it may still have other antiquated records on its systems, and I would like to see them.

96.    Nevertheless, as of March 17th, there was nothing on Northwell's website to indicate that any data breach ever occurred. This conflicts with the company's policy #800.17, entitled "HIPAA and State Privacy Breach Notifications", which echoes HHS and FTC's requirements. If Northwell contracted with PJ&A to handle its statutory data breach notification duties, there is no visible documentation to support that… assuming that it is possible to contract out such duties. Northwell has a history of engaging in finger-pointing to avoid responsibility, which is evident in all of my 2017-2018 deposition transcripts. The company despicably pointed the finger of blame for its own misconduct to me, my parents, my doctors, and anyone else it could think of to dodge accountability. Its attempt to pin the responsibility for the Data Breach entirely on its vendor, PJ&A, is just one more example of Northwell's evasive tactics.

97.    Rather than being a victim of its vendors, as it would like the public to think, Northwell sprayed my medical records around like a flame thrower, over which it had control.

98.    When I requested more medical records from Northwell (in addition to the 2011 ones I already had), I found that there is yet another party involved in this process. Northwell referred me exclusively to a company called MRO Corp. of Norristown, PA, with the trademarked strapline "accelerating clinical data exchange". However, I never signed an authorization allowing Northwell to perform any treatments on me or to share my mental healthcare records with any other party. MRO's website says, *inter alia*, "MRO is transforming how clinical data is exchanged by combining our unmatched expertise with innovative solutions powered by advanced digital tools and capabilities" (https://mrocorp.com). In order to obtain my records, the company told me that I needed to log in to MRO's portal, but repeatedly sent me a portal link that did not work. When I requested my records from Northwell, I did not know that a third party would be handling these sensitive materials. This company wasted yet more of my time, before finally sending me my 2011 records – proving conclusively that the 13-year-old records are still on the Defendants' computer systems. Included were some additional important pages that should have been included in prior discovery, but weren't.

99.    This type of outsourcing might be legal in the case of a voluntary patient who has signed Northwell's authorization forms and has not challenged the content of his records, but in the case of an involuntary patient who has not signed, it is unlawful – especially when he finds false statements in his records. Since I have confirmed that Northwell shared my records with both PJ&A and MRO, this justifies discovery into what documents were shared, and whether there were additional recipients of my records from Northwell.

100.    I learned that two more companies called Healthix (based in New York City) and Ciox (part of Datavant of San Francisco) routinely provide medical records retrieval services to

Northwell patients. Apparently Ciox also received my records without my authorization, since one of the pages that Northwell produced this month was stamped that it had been received by Ciox. I do not yet know whether any more parties received my records; that is a matter for discovery.

101. These conversations have stretched out over several months, an example of Northwell's typical strategy of runarounds and time-wasting in an attempt to exhaust plaintiffs' SOLs.

**The NYS Office of Mental Health (OMH)**

102. I also re-contacted the NYS Office of Mental Health (OMH) in Albany in January to attempt to obtain the quality assurance records of its investigation into my complaint to it about Northwell. I had tried to obtain those records administratively starting in 2012. OMH is the NY mental healthcare industry's primary regulatory body.

103. A patient's family members have a right to obtain her records, with her permission, under the HIPAA Privacy Rule (45 CFR 164.510(b)) and NYMHL §33.25. My mother, Dr. Shirley Andersen, a physician, asked OMH for its records pertaining to me (in letters dated Dec. 4th and Dec. 7th, 2023), but OMH's Office of Quality Improvement advised her to ask Northwell for them. This was grossly conflicted – as absurd as if it had told my mother to contact my rapist to obtain a police report about his having raped me.

104. So, I asked Northwell for the quality assurance records. According to OMH, Northwell had my quality assurance records in its possession at the time that discovery occurred in 2017. However, it failed to produce them, after having provided a statement in May 2017 to the effect that the Bates-stamped certified record it produced was my entire file.

105.    Mr. Sandhusen sent me a letter dated March 5th, saying "with respect to your request to obtain copies of quality investigation records related to an investigation conducted by the New York Office of Mental of Health, such records are not part of your designated record set and are privileged.  As such, it is Northwell's practice, as permitted by federal and state regulations, to not disclose such records."  In other words, Northwell is covering up the quality assurance records.  There is no other place of which I am aware to obtain these records administratively, if OMH and Northwell refuse to do so.  Northwell was asking to be sued.

**The Record Retention is into Overtime**

106.    The existence of my records on the Northwell-PJ&A systems at the time of the breach in 2023 was improper, because medical records are normally only retained for six years in New York (see 10 NYCRR §405.10(a)(4), and 42 CFR §482.24(b)(1)), with a maximum of ten years.  This practice is echoed in Northwell's policy number 100.97, entitled "Records Retention and Destruction"[8] (page 24) which also specifies the means by which electronic medical records must be destroyed after expiry.  This policy says, "The disposal date must always be no later than December 31 of the last year for which the Record must be retained."  In North Carolina, the retention period for records pertaining to adults is eleven years (N.C. Admin. Code 13B.3903), but Northwell's policy echoes the New York standards.

107.    My 2011 medical records should have been destroyed by the end of 2021, and the 2012 records by the end of 2022.  However, they were still on the system in mid-2023 when the breach occurred, and they are still on Northwell's and MRO's systems today.

---

[8] https://www.northwell.edu/sites/northwell.edu/files/d7/100.97%20Records%20Retention%20and%20Destruction.pdf

108.    By retaining my medical records for years longer than the maximum retention period, and failing to adequately encrypt them, PJ&A and Northwell exacerbated the risk of a data breach. Even if Northwell's defense attorneys – Heidell Pittoni Murphy & Bach (HPMB) – were required to keep the records in their files due to my litigation, this would not have meant that either Northwell or PJ&A also needed to retain my records on their electronic medical record systems. Industry standards require Northwell to have a vendor compliance policy[9], and to conduct periodic quality assurance audits to ensure that its vendors comply. Medical records remaining on the system past the expiry date should have been a red flag to a quality assurance auditor. Additionally, defense attorneys HPMB should have instructed their client to destroy or at least encrypt my records, to eliminate the risk of another leak. However, Northwell was evidently uninterested in preventing further harm to me, which shows bad faith.

109.    In its Notice of Data Breach, PJ&A directed me to take certain steps to protect my Private Information such as "review[ing] financial accounts and report[ing] any suspicious or unrecognized activity immediately." Further, Defendants directed me to be "vigilant for the next 12 to 24 months and report any suspected incidents of fraud to the relevant financial institution." However, I had already been doing these things since Northwell first visibly splashed my Private Information onto the Suffolk County Court docket in 2014, so the Notice only demanded a continuation of my ongoing state of hypervigilance.

110.    As a result of the Data Breach and Defendant's Notice, I spent time dealing with the consequences of the Data Breach, which included self-monitoring my accounts and credit reports to ensure no fraudulent activity had occurred, and doing hundreds of hours of additional research, the product of which can be seen in this complaint.

---

[9] https://www.northwell.edu/sites/northwell.edu/files/2023-11/800.41-requests-for-disclosure-of-ehi-picg.pdf

111.    The harms caused to me cannot be undone. I further suffered actual injury in the form of damages to and diminution in the value of my Private Information – a form of intangible property that I entrusted to Defendants, which was as a result of the Data Breach. I also lost my benefit of the bargain by being involuntarily contracted to a Defendant that failed to provide the data security promised. I suffered lost time, annoyance, and inconvenience as a result of the Data Breach, and it has caused me anxiety about the loss of my privacy. I have suffered imminent and impending injury arising from the risk of fraud, identity theft, and misuse resulting from my Private Information being placed in the hands of unauthorized third parties and possibly criminals.

112.    Future identity theft monitoring is reasonable and necessary, and such services will include future costs and expenses. The Notice of Data Breach only offered only one year of free basic monitoring with Experian Identity Works[SM], which is totally inadequate given my special circumstances. I will require permanent high-level monitoring for the rest of my life, due to the extreme, repetitive nature of the Defendants' breaches of my Private Information and the resulting excess of barbarians at my gates. To protect myself from further harm, I use Norton LifeLock's highest level service at $300/year. I also pay for additional defensive services such as phone and email spam blocking, anti-malware apps, dual cellphones, two extra phone lines, a Virtual Private Network (VPN) and two mail collection services. I have credit freezes in place at all three credit bureaus, which is protective but makes other administrative tasks more complicated. I need but do not have an administrative assistant to help me manage all this.

113.    I have a continuing interest in ensuring that my Private Information – which, upon information and belief, remains in Defendants' possession – is destroyed, or at least safeguarded from future breaches.

114.    The following facts maintain my claims within the SOLs: (a) the Data Breach occurred between March 27th and May 2nd, 2023, but was not announced to victims or the public

until November 3rd 2023, (b) my medical records remain on the Defendants' servers to the present day, (c) new documents have recently been produced, and (d) certain key documents need to be produced, such as the quality assurance documents which Northwell recently refused to produce. Although probably unnecessary here, the SOLs could likely also be tolled due to the many other instances of information chilling and obstruction of justice to which I have been subjected.

**The Data Breach was Foreseeable**

115.    Defendants knew, or should have known, of the importance of safeguarding patients' Private Information such as mine and the foreseeable consequences that would occur if Defendant's data security system were breached, including, specifically, the significant costs that would be imposed on afflicted individuals including me as a result of a breach.

116.    Defendants were aware, or should have been so, of the unique type and the large volume of data on Defendants' networks, amounting to potentially millions of individuals' personal information and, thus, the significant number of individuals who would be harmed by the exposure of unencrypted data. Defendants' data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in the healthcare industry preceding the date of the breach.

**Value of PII and PHI**

117.    The Private Information of consumers remains of high value to criminals, as evidenced by the prices offered through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, online banking login information costs an average of

$100. Full credit card details can be purchased for $10 to $100. Criminals can also purchase access to entire data breaches for $1000.[10]

**Defendants Failed to Properly Protect My Private Information**

118.    Defendants could have prevented this Data Breach by properly securing the systems containing my Private Information and encrypting the data. It was also Northwell's responsibility to require in its vendor contract with PJ&A that the data be encrypted. It a matter for discovery to see what the contract actually demanded. Furthermore, Defendants should have followed their own policies to destroy outdated records.

119.    Despite the prevalence of public announcements of data breaches, Defendants failed to take appropriate steps to protect my Private Information from being compromised.

120.    The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."

121.    The ramifications of Defendants' failure to keep my Private Information secure are long lasting and severe. Once Private Information is stolen, fraudulent use of that information and resulting damage to victims may continue for years.

---

[10] https://www.insurancebusinessmag.com/us/news/breaking-news/revealed--how-much-is-personal-information-worth-on-the-dark-web-444453.aspx

122.    To prevent and detect unauthorized cyberattacks, Defendant could and should have implemented, as recommended by the U.S. Department of Justice[11], several measures such as firewalls, spam filters, centralized patch management systems, anti-virus and anti-malware programs, implementing access controls with least privilege, Software Restriction Policies (SRP), disabling macro scripts, disabling Remote Desktop Protocol (RDP), and application whitelisting.

**Defendants Failed to Comply with FTC Guidelines**

123.    The Federal Trade Commission ("FTC") has promulgated guides for businesses which highlight the importance of implementing data security practices. According to the FTC, the need for data security should be factored into all business decision making.

124.    FTC issued a publication written in plain English entitled, "Protecting Personal Information: A Guide for Business"[12], which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested

---

[11] https://www.justice.gov/criminal-ccips/file/872771/download
[12] https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business

methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

125.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect patient data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. §45. I have seen no evidence to date that there has been any enforcement action against Northwell or PJ&A.

126.     Upon information and belief, Defendants failed to properly implement basic data security practices. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to my Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. §45.

127.     Additionally, Defendants were required to file an incident report with both the U.S. Department of Health and Human Services ("HHS") and FTC, but PJ&A only stated that it notified HHS. FTC requires that it be notified within ten days of the incident.[13] To the best of my knowledge, Northwell and PJ&A have not publicly disclosed their incident reports.

**Defendants' Conduct Violates HIPAA and Evidences Insufficient Data Security**

128.     HIPAA requires covered entities and business associates of covered entities like Defendants to protect against reasonably anticipated threats to the security of sensitive patient health information.

---

[13] https://www.ftc.gov/system/files/documents/rules/health-breach-notification-rule/health_breach_form.pdf

129.    Covered entities must implement safeguards to ensure the confidentiality, integrity, and availability of Private Information. Safeguards must include physical, technical, and administrative components. These include *inter alia* encryption. It is hard to imagine how a hacker would have been able to access patients' records on PJ&A's servers if the data had indeed been properly encrypted, unless the hacker was a company insider who had the encryption key. This needs to be explored in discovery.

130.    The HIPAA Breach Notification Rule, 45 CFR §§164.400-414, requires HIPAA Covered Entities and their Business Associates to provide notification following a breach of unsecured protected health information. The Rule says, "A breach is, generally, an impermissible use or disclosure under the Privacy Rule that compromises the security or privacy of the protected health information." There are a few exceptions that do not apply in this context, and the burden of proof is on the leaker to show that an exception applies. Any bad-faith use of the information – such as Northwell's – is not eligible for an exception. This Rule demands that notification be given to the affected individuals and the US Dept. of Health and Human Services (HHS) Secretary in the event of a breach (id., ¶168; also see 45 CFR §164.408).

131.    Data breaches are Security Incidents under HIPAA because they impair both the integrity (interpretability) and accessibility of patient health information. The presence of ransomware (or any malware) on a covered entity's or business associate's computer systems is a security incident under the HIPAA Security Rule. A security incident is defined as the attempted or successful unauthorized access, use, disclosure, modification, or destruction of information or interference with system operations in an information system. See the definition of security incident at 45 C.F.R. 164.304. Once the ransomware is detected, the covered entity or business associate must initiate its security incident and response and reporting procedures. See 45 CFR 164.308(a)(6).

132.    Defendants' Data Breach resulted from a combination of insufficiencies that demonstrates Defendants failed to comply with safeguards mandated by HIPAA regulations.


**Several more government agencies have been aware of the problems for more than a decade**

133.    In addition to OMH and the NYSAG, several City, State and Federal agencies, and the UK government, have been aware of the problems at Northwell and its conspirators for nearly 13 years, but I have seen no evidence that they have done anything about it.  There has been an utter failure of the law enforcement and regulatory functions, and has resulted in the situation that my only hope for access to justice is through this litigation.

134.    I discussed the City of NY's misconduct in *Andersen v. BA*. (¶30 and 109 et. seq.), and the Nassau case (¶15, 196, 262).  The NYPD lied to me by telling me that penal code did not apply in a psych ward; the City later corrected that false statement, but the NYPD still failed to investigate.  The City also fraudulently charged me $600 after its ambulance transported me in handcuffs to Northwell's human parking garage, after confiscating and towing my vehicle, for no valid reason and without ticketing.

135.    I contacted every District Attorney in the Long Island and NYC area, who either ignored me or told me it was out of their jurisdiction.  For example, the Nassau County DA at the time, Kathleen Rice (Democrat, who sat and still sits on the Board of Northwell-backed Touro Law School), fabricated a statement that Northwell (headquartered in Nassau) was out of her jurisdiction.

136.    There were several additional State agencies that showed me deliberate indifference: the Justice Center (*Andersen v. BA*, ¶70), the Mental Hygiene Legal Service (Nassau case, ¶59), the Office of Professional Medical Conduct, the Inspector General, and the NYS Tax

Dept. The indifference was part of the State's ongoing plan to protect its favorite company from criticism at any cost.

137.    A woman from FBI New York called Christine Doyle phoned me in November 2017 pursuant to my complaint and indicated she was doing some level of investigation. She said there was a lot of material in my file, although she refused to explain what this meant (see *Andersen v. Sullivan* petition, ¶107). This seemed no better than taunting. I sent her some evidence by email, but never heard from her again, even though I tried repeatedly to reach her (e.g. ten emails from 2017-2024). I updated her again by email on February 5th 2024, with the information about the PJ&A breach, but did not receive a response.

138.    To the best of my knowledge, no ransomware gang has yet taken responsibility for the PJ&A breach, unlike other healthcare breaches such as Lehigh Valley Health Network in 2023 by the BlackCat hacker gang.[14] Why did FBI get visibly involved in other breaches, but not in the PJ&A breach which had many more victims?

139.    I wrote to both FBI Directors Christopher Wray and James Comey, neither of whom responded. I believe they have their heads in the sand regarding the Brady Law (*Andersen v. BA*, ¶258 et. seq.) Judge Brown's mentor and Northwell's crony, Chuck Schumer, reared his mightily conflicted head yet again, as the author of this law. FBI apparently doesn't want conservatives to know that it put 6 million Americans' medical records in its NICS database over the past 30 years – in the style of J. Edgar Hoover's blacklist – thereby silently depriving these citizens of their gun rights.

140.    FBI investigated in 2013 when three people conspired to fraudulently take money from funds established to pay victims of the 2010 Deepwater Horizon oil spill. The instant case

---

[14] https://www.beckershospitalreview.com/cybersecurity/lehigh-valley-notifies-627-patients-affected-by-february-ransomware-attack.html

bears similarities, because the Defendants in the instant case are attempting to obstruct justice to avoid having to compensate victims of the Data Breach.

141.    I also tried to get FBI's attention with a *pro se* case in US District Court against FBI NY Director George Venizelos in 2013 (*Andersen v. Venizelos*, index no. 13-cv-4370, EDNY). Judge Joseph Bianco dismissed it, saying he could not order FBI to do anything. At the time I did not know enough about litigation to fully evaluate this decision.

142.    However, the deliberate indifference didn't stop at FBI. USDOJ has been sitting on my latest complaint since Sept. 2020, which I submitted to then-AG William Barr. This was after I had waited for a substantive response to a previous letter since 2012, to then-AG Eric Holder. So, this matter has spanned three US presidential administrations: Obama, Trump and Biden. The Obama and Trump DOJs acknowledged my complaints, but then as far as I can tell nothing else happened.

143.    I reported Northwell's docket doxing to HHS, but HHS told me only the NYSAG could take corrective action. This effectively sent my complaint to die in Albany. When I wrote to HHS about the PJ&A Data Breach, it failed to respond.

144.    The other Federal agencies' responses were no better. I filed a report with the FTC in January 2021 (Report number: 127141423), but did not receive a response. After a previous complaint to it, FTC told me it does not resolve individual complaints, but it can, however, act when it sees a pattern of possible violations developing. The FCC didn't respond to my complaints about Northwell's illegal wiretap policies. The SEC didn't respond to my detailed complaint about UnitedHealth, which is a publicly listed company. The IRS pretended not to see any tax fraud in Northwell's fraudulent billing for profitable involuntary hospitalization services accounted for as charitable activities. The US Postal Service feigned ignorance about the fact that mail carriers are

not allowed to enter a psych ward (*Andersen v. BA*, ¶356). The CIA would neither confirm nor deny any classified association between it and me (id., ¶248), which I will discuss further.

145.    The British government was involved because I am a British citizen who was detained while attempting to travel to the UK. Also, British Airways PLC is the flag carrier airline of the United Kingdom. I received two letters from Number 10 Downing Street (see *Andersen v. BA*, ¶273 and Exhibit J) from when Prime Minister David Cameron (Conservative) was in office, saying that it was considering the matter. This was better than the zero response I received from three White Houses, but still inadequate. Then Number 10 stopped responding, through the tenures of two more Prime Ministers. The Border Force and BA refused to identify the immigration agent who spoke to me by phone at JFK, or provide me with substantive further information.

146.    The chilling on the other side of the Atlantic has hindered my quest for justice in America, and vice versa. I reported the matter to Scotland Yard, which said it could not get involved because the events occurred outside the UK (except of course when it wants to, e.g. Princess Diana). MI5 took my complaint in person, then ignored me. MI6 did not acknowledge my complaint, despite its close relationship with the CIA. I approached Interpol, which said it could not get involved unless a national law enforcement agency did. The United Nations Human Rights Council did not respond to my complaint.

147.    The foregoing illustrates why this civil action is necessary, and if I do not achieve justice here, the deprivation of my due process rights will be complete. Few plaintiffs have ever tried as hard as I have to see justice served. The failure of the system to check abuse allowed the individuals in law enforcement and regulatory agencies to avoid using their prosecutorial power, and to practice deliberate indifference – often for partisan political ends. The degree of apathy in government at City, County, State, Federal and international levels has been breathtaking.

148.    However, more than three-quarters of Americans now view cyberterrorism as the most critical threat to U.S. vital interests (source: *Gallup,* 2024).  How many more Northwell and PJ&A victims do there need to be before the court system and law enforcement take notice of these repeat offenders?

## V:  INJURIES AND DAMAGES

149.    As result of Defendants' ineffective and inadequate data security practices, I now face a present and ongoing risk of fraud and identity theft.  I continue to suffer as a result of the Defendants' cover-up of their misconduct.  They have only recently (March 2024) produced old documents that should have been included in prior discovery, which could have resulted in my prevailing in previous litigation.

150.    Due to the Data Breach, and the foreseeable consequences of Private Information ending up in the possession of criminals, the risk to me of identity theft has materialized and is imminent, and I have sustained actual injuries and damages, including: (a) invasion of privacy; (b) thousands of hours lost litigating this matter both *pro se* and with inadequate attorneys; (c) the productivity losses from the psychological toll of sleep loss, anxiety, and fear; (d) loss of income from being forced to sacrifice time from my day job to do *pro se* litigation; (e) "out of pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (f) loss of time and loss of productivity incurred mitigating the same; (g) "out of pocket" costs and loss of time incurred due to actual identity theft; (h) the loss of benefit of the bargain (price premium damages); (i) diminution of value of my Private Information; and (j) the continued risk to my Private Information, which remains in Defendant's possession, and which is subject to further breaches, so long as Defendants fail to undertake appropriate and adequate measures to protect my Private Information.

151.    The Defendants' constant harassment and the litigation they have forced me to undertake have caused me many problems. They have been a disruptive distraction from my career in medical technology, and has resulted in significant financial losses to me, in the millions of dollars. It has set my career back decades, so I have fallen way behind my peers. In addition, the litigation has gobbled up so much of my time, energy and money that I have had little left for my children. This meant they spent time with others instead, some of whom I considered bad influences. The Defendants have so disturbed my social life and undermined my faith in human decency that I have not been able to establish a lasting new relationship. They have caused family arguments and rifts that would not otherwise have occurred. They have isolated me so that I have been nearly devoid of moral support. I fear I will never recuperate from the adverse effects of the bullying, and will be solo for the rest of my life. I never imagined my life would be so miserable at age 61.

152.    I am only interested in financial compensation, and some recognition that my 13 years of hard work on this matter was not in vain. If the individual Defendants' employment were terminated, it would do nothing to improve my life, although evidently, they need some reeducation for the sake of future patients. If they aren't fired, they should be forced to retake their professional oaths which they have apparently forgotten. Given the severity of this disaster, perhaps a more technology-literate, benevolent and enlightened individual than Mr. Dowling (age 71), should be in charge of this so-called "charity".

**HIPAA fines, and the NCAG**

153.    HIPAA is a regulatory statute; no private cause of action exists under it. However, a state attorney general and this Court have the ability to impose fines on litigants who expose plaintiffs' Private Information. I asked the NYSAG to take corrective action, but instead, the

aforementioned buffoon, "Alex", called me in 2021 and engaged in gaslighting. He made it clear that the NYSAG had no intention of disciplining the doxers.

154.    I filed another complaint with the NYSAG after I received the PJ&A Notice of Data Breach on December 1st, 2023 but did not receive a response. The NYSAG informed me that it sent my complaint to the North Carolina Attorney General (NCAG), Josh Stein (File No. CP-24-01313), on January 17th. The NCAG's office wrote to Northwell on January 25th demanding a response to the complaint within 15 days (Exhibit 4).

155.    Northwell responded on February 12th (Exhibit 5), in a letter from Kimberly White, Vice President, Corporate Privacy Officer, which was extremely misleading. She bluffed by telling the NCAG that the matter was closed because *Andersen v. BA* had been dismissed. I replied that *Andersen v. BA* was filed prior to the 2023 Data Breach. If PJ&A had sent out its Data Breach Notice on a timely basis in May 2023 instead of in November – which was five months past the statutory maximum delay – SCOTUS might have been motivated to hear my petition. PJ&A very likely sent its Notice out late in order to help Northwell scupper my SCOTUS petition. The company also waited to send out its Notice until it was too just a few days too late for me to file a Rule 60b motion. The fact that my SCOTUS petition was visibly pending during their delay, and that they waited for my petition to be denied before issuing their Notice, looks very bad for Northwell-PJ&A. This situation reeks of collusion. The Defendants have a lot of explaining to do.

156.    Ms. White also told the NCAG that none of my cases survived the motion to dismiss. This was a transparently false statement, and amounts to defamation and obstruction of justice. One of my cases did survive: *Andersen v. North Shore Long Island Jewish Health System (NSLIJ) et. al.*, Supreme Court of Nassau, index #602687/2015. ("*Andersen v. NSLIJ*", not appealed due to COVID). I have about 2500 pages of deposition transcripts from that case which

are very informative, and which contain important evidence relevant to all of the Data Breach victims.

157.    As a result of Ms. White's disingenuous letter, the NCAG decided not to proceed, saying "it appears that there is a dispute about the facts regarding this matter. Where a dispute exists between parties, we may request their cooperation in arriving at a solution, as we have done with your complaint. However, we cannot dictate to the parties how the matter should be resolved" (Exhibit 6). I replied (Exhibit 7), but Ms. White had cast enough of a false shadow of doubt over the scene to prevent the NCAG from acting. She failed to withdraw her false statement, and did not reply further.   This demonstrates Northwell's contempt for the truth and aptitude for smokescreening, which has been a theme since June 2011.

158.    I then wrote to Ms. White's superior, Greg Radinsky, Northwell's Chief Corporate Compliance Officer. It is likely that Eric Sandhusen also reports to him. Mr. Radinsky "began his career as a fraud and abuse attorney in the Office of Inspector General (OIG) for the U.S. Department of Health & Human Services."   So, if anyone should understand the extent of Northwell's fraud and abuse, he should.   His assistant told me he received my message and told me that Mr. Radinsky would "get back" to me. I did not receive a response.


**"Tier 4" HIPAA violations**

159.    "Tier 4" HIPAA violations are the most serious type and the kind that has been committed here; they involve willful neglect of HIPAA rules and no effort made to correct the violation within 30 days of discovery (42 USC §1320d-5, 42 USC §1320d-6). The maximum fine for a Tier 4 violation is $50,000 per violation, up to $1.5m per year. Offenses committed under false pretenses – which is surely the case here – allow penalties to be increased to a $100,000 fine, with up to 5 years in prison.

160.    Offenses committed with the intent to sell, transfer or use individually identifiable health information for commercial advantage, personal gain or malicious harm permit fines of $250,000 and imprisonment up to ten years. This applies in my case, since Northwell admits in its policies that it collects and sell patients' PHI and PII to data brokers for profit, as discussed *supra*. My adversaries have also used my PHI and other confidential information maliciously to gain advantage over me in the courtroom (see *Andersen v. BA* amended complaint, ¶¶129, 233). Although Northwell is such a large company that HIPAA fines would be insignificant in its overall financial picture, fines would nevertheless send a message that the justice system intends to take such violations seriously.

161.    There is nothing in the statute to prevent such fines being paid to the victim, and since neither HHS nor the NYSAG contributed anything toward proving the offenses were committed, so that I had to do all the work myself, I request that the fines be paid to me.

162.    None of the judges of my various actions ever ruled on whether HIPAA fines should be imposed, so there is no claim preclusion or collateral estoppel problem. I did attempt clumsily to use HIPAA in my first Federal action (in 2012, at EDNY), but my former attorney withdrew it in a subsequent iteration of the complaint.

163.    I do not need any new laws to be written; I only need existing laws to be enforced for a change.


**NYS SHIELD Act fines**

164.    In addition to HIPAA fines, Under the Stop Hacks and Improve Electronic Data Security Act ("SHIELD Act") of 2019, an Attorney General may seek injunctive relief, restitution, and penalties against any business entity for violating the law. For failure to provide timely notification, the court may impose a civil penalty of up to $20 per instance of failed notification,

not to exceed $250,000. For failure to maintain reasonable safeguards, the court may impose a civil penalty of up to $5,000 per violation.[15] Since the NYSAG is practicing selective enforcement, and has failed to do her job by levying such fines, this Court could impose such a penalty and award it to me.

## VI: CAUSES OF ACTION

### FIRST CAUSE OF ACTION:

### NEGLIGENCE

165.    I repeat and re-allege each and every allegation set forth paragraphs "1" through "164" as if fully set forth herein.  (See also *Andersen v. BA*, amended complaint, ¶411 et. seq.)

166.    Typically, to prove a claim in negligence, a plaintiff must prove that (1) the defendant had a duty to exercise reasonable care, (2) the defendant failed to meet that duty, (3) the plaintiff suffered injuries, and (4) the defendant's failure to exercise reasonable care was both the actual and proximate cause of the plaintiff's injuries.

167.    The statute of limitations for negligence in both NC and NY is three years.  My negligence claims are within the SOL since the Data Breach occurred less than one year ago.  They have been refreshed since Northwell produced documents in March 2024 that should have been included in prior discovery.

168.    Defendants required me to submit Private Information in order to obtain healthcare services.  When Defendants stored my Private Information in their computer systems, they undertook a duty to me:  (a) to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, policies, and

---

[15] https://ag.ny.gov/resources/organizations/data-breach-reporting/shield-act

procedures, and the personnel responsible for them, adequately protected the Private Information, (b) to safeguard the Private Information due to the foreseeable risk of a data breach and the severe consequences that would result from its failure to so safeguard the Private Information, (c) to use reasonable security measures arose as a result of the special relationship that existed between Defendants and Northwell's patients, which is recognized by laws and regulations including *inter alia* HIPAA and the FTC Act, as well as common law. Defendants were in a position to ensure that their systems were sufficient to protect against the foreseeable risk of harm from a data breach.

169.    Several NY State laws establish the standard of care, and NC's are similar. Northwell used NYMHL §9.39 and §9.27 to detain me involuntarily, and create the medical records.  NYMHL §33.13 is the State statute that gives patients special privacy protection for mental health reasons, with which Northwell and PJ&A failed to comply.  NYMHL §33.25 establishes my entitlement to all of my records, but Northwell only provided a subset of the records for the first six years, until discovery occurred in my Nassau Supreme Court case. (NB: Instead of giving the records to me as it was supposed to do, Northwell gave them to PJ&A, which leaked them.) If Northwell had any indemnification agreement with PJ&A to protect the latter from errors in the former's records, it was likely inapplicable in my case because I did not sign an authorization that would have allowed Northwell to share my Private Information with PJ&A.  I did not even know PJ&A was involved until November 2023.

170.    Defendants' duties to use reasonable security measures under HIPAA required Defendants to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. §164.530(i)(1).  Some or all of the healthcare information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

171.    In addition, Defendants had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. §45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

172.    Defendants' duties to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendants are bound by industry and professional standards to protect confidential Private Information that it either acquires, maintains, or stores.

173.    Defendants breached their duties, and thus were negligent, by failing to use reasonable measures to protect my Private Information, as alleged and discussed above, and to notify me without delay when the Data Breach occurred.  New York General Business Law 899-aa, NY State Technology Law 208, and the NYS SHIELD Act of 2019 all demand notification of a data breach without delay. The equivalent laws in North Carolina are General Statutes 75-61 and 75-65.  HIPAA Section 13402(d) and the implementing regulations at §164.404(b) require covered entities to notify individuals of a breach without unreasonable delay but in no case later than 60 calendar days from the discovery of the breach, except in certain circumstances where law enforcement has requested a delay, and there is no evidence this applies here.

174.    It was foreseeable that Defendants' failures to use reasonable measures to protect Private Information would result in injury to me. Further, the breach of security was foreseeable given the high frequency of data breaches in the healthcare industry.

175.    Defendants' duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendants and Northwell's patients, which is recognized by laws and regulations including but not limited to HIPAA and the FTC Act, as well

as common law. Defendants were in a position to ensure that its systems were sufficient to protect against the foreseeable risk of harm from a data breach.

176.    Defendants' duties to use reasonable security measures under HIPAA required Defendants to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. §164.530(i)(1). Some or all of the healthcare information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

177.    In addition, Defendants had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. §45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

178.    Defendants' duties to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendants are bound by industry standards to protect confidential Private Information that they either acquire, maintain, or store. Defendants breached their duties, and thus were negligent, by failing to use reasonable measures to protect my Private Information, as alleged and discussed above.

179.    It was foreseeable that Defendants' failures to use reasonable measures to protect Private Information would result in injury to patients such as me. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the healthcare industry. In fact, Northwell issued a press release in February 2023[16], an article entitled "Rise in third-party data breaches requires updated risk management approach". This

---

[16] https://healthitsecurity.com/news/rise-in-third-party-data-breaches-requires-updated-risk-management-approach

article stated that "the majority of the top ten largest healthcare data breaches reported to HHS in 2022 stemmed from third-party vendors." Vendors include transcription companies like PJ&A. This was the second major vendor data breach to affect Northwell in 2023. The company was also affected by a hacking incident at vendor Nuance Communications, with 1.2m victims. So, Northwell cannot claim that it wasn't aware of the risk of breaches from third-party vendors prior to the PJ&A breach. It was therefore foreseeable that the failure to adequately safeguard Private Information would result in injuries.

180. The imposition of a duty of care on Defendants to safeguard the Private Information they maintained is appropriate because any social utility of Defendants' conduct is outweighed by the injuries I suffered as a result of the Data Breach.

181. As a direct and proximate result of Defendants' negligence, I am at a current and ongoing risk of identity theft, and I sustained compensatory damages including: (a) invasion of privacy; (b) financial "out of pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (c) loss of time and loss of productivity I incurred through this litigation, and having to mitigate the identity theft risk, including *inter alia* having to repeat previous litigation because I discovered that PJ&A sent its Data Breach Notice out extremely late, and Northwell made false statements and omitted key documents from prior discovery; (d) financial "out of pocket" costs and loss of time incurred due to actual identity theft; (f) loss of time due to difficulty establishing credibility with lawyers, judges, regulators, and politicians; (g) diminution of value of my Private Information; (h) future costs of identity theft monitoring; (i) worsening of my PTSD and depression; (j) anxiety, annoyance and nuisance, and (k) the continued risk to my Private Information, which remains in Defendants' possession, and which is subject to further breaches, so long as Defendants fail to undertake appropriate and adequate measures to protect my Private Information.

182.    Defendants' negligent conduct is ongoing, in that they still hold my Private Information in an unsafe and insecure manner. I would like my medical records to be deleted in their entirety from the Defendants' computers, and provide adequate credit and identity theft monitoring for the rest of my life.  If deletion is impossible, I am entitled to injunctive relief requiring Defendants *inter alia* to (i) strengthen their data security systems and monitoring procedures and (ii) submit to future regular audits of those systems and monitoring procedures.

## SECOND CAUSE OF ACTION:

### NEGLIGENCE *PER SE*

183.    I repeat and re-allege each and every allegation set forth in paragraphs "1" through "182" of this complaint as if fully set forth herein.

184.    The elements of negligence (*supra*) apply to negligence *per se*.  The latter, however, assumes the failure to exercise reasonable care based on the defendant's violation of a law which was intended to protect the public. If a defendant is negligent *per se*, then the plaintiff must prove only the issue of proximate cause.

**185.**    Defendants breached their duties to me under the FTC Act, HIPAA, the NYS SHIELD Act, and the NYMHLs by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard my Private Information.  Defendants also failed to fulfill their duties to notify me without delay when the Data Breach occurred, which according to these laws is **in no case later than 60 calendar days from the discovery of the breach** (see cause of action for Negligence, *supra*).  Defendants' failures to comply with applicable laws and regulations constitutes negligence *per se*.  Pursuant to Federal Trade Commission, 15 U.S.C. §45, Defendants had a duty to provide fair and adequate computer systems and data security practices to safeguard my Private Information.  Pursuant to HIPAA, 42 U.S.C. §1302(d), et seq., Defendants

had a duty to implement reasonable safeguards to protect my Private Information. Pursuant to HIPAA, Defendants had a duty to render the electronic Private Information it maintained unusable, unreadable, or indecipherable to unauthorized individuals, as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key." See definition of encryption at 45 C.F.R. §164.304.

186.    But for Defendants' wrongful and negligent breach of their duties owed to me, I would not have been injured. The injury and harm suffered by me was the reasonably foreseeable result of Defendants' breach of their duties. Defendants knew or should have known that they were failing to meet their duties, and that Defendants' breach would cause me to experience the foreseeable harms associated with the exposure of my Private Information.

187.    As a direct and proximate result of Defendants' negligence *per se*, I have a current and ongoing substantial risk of identity theft.

### THIRD CAUSE OF ACTION:

### NEGLIGENT HIRING, RETENTION AND SUPERVISION

188.    I hereby repeat and reallege paragraphs "1" through "187" herein, as if each has been fully set forth at length.

189.    The elements of a negligent supervision claim include: (a) the defendant and the tortfeasor employee were in employer-employee relationship; (b) the defendant knew of the tortfeasor's propensity to commit the tortious act or should have known of such propensity had the defendant conducted an adequate hiring procedure; (c) the defendant supervised and retained the employee despite his propensity to commit the tortious act; and (d) the plaintiff suffered damages proximately caused by the defendant's negligent hiring, retention or supervision.

190.    The individual Defendants in supervisory positions, which includes all of them –
Mr. Hubbard, Mr. Dowling, Mr. Schulman, Dr. Kane, Mr. Radinsky, Ms. White, and Mr.
Sandhusen – created a work environment where deliberate indifference to serious misconduct
could occur without fear of reprimand.  Mr. Hubbard has so many heavy job titles – President,
Treasurer, Director & Secretary – that he has virtually guaranteed he will be sued in a supervisory
negligence case.  Mr. Dowling and Dr. Kane were defendants in *Andersen v. BA*, and Mr. Schulman
was a defendant in the Nassau case; they reappear here due to new information that affects them.
Research studies such as the Milgram and Stanford Prison Experiments showed the importance of
authority in creating cruel employees, and Dr. Kane was ultimately responsible for the staff (e.g.
Karlin, Hanna, Brar) who pretended to show empathy while they were improperly documenting
my private life and concocting stories to use in a smear campaign against me, which PJ&A and
Northwell published.  Dr. Kane set a bad example for his employees and students by failing to
maintain his NYS physician registration for **ten years** (*Andersen v. BA*, ¶73).  (Mr. Dowling –
seemingly oblivious to hypocrisy, and to the injury he has caused – referred in Becker's on
December 29th to "headline-seeking politicians, narcissistic CEOs and media celebrities who daily
promote bigotry, misinformation and conspiracy. They help to undermine the value of democracy,
promote dysfunction and a decline of respectability.")

**191.    The New York State SHIELD Act of 2019 mandates – *inter alia* – that officers
of companies such as PJ&A and Northwell – such as PJ&A's President, Jeffrey Hubbard,
and Northwell's CEO Michael Dowling – take personal responsibility for data security.  That
is the primary basis for their inclusion here as Defendants, in addition to the Northwell
supervisors' personal involvement with the violations.**

192.    Supervisory negligence can be established using the following elements: (1) duty
of care, (2) breach of that duty, (3) causation, and (4) damages.  As discussed in the foregoing, it

is evident that all of the defendant supervisors created a policy or custom under which unlawful practices occurred, or allowed the continuance of such a policy or custom. They showed me deliberate indifference when I complained about the violations. Their underlings deleted my written administrative complaints from the records, and/or failed to properly follow up on them. Northwell and its conspirators have been dodging my requests for certain documents for 13 years. The degree to which each of these supervisors participated directly in the violations is a matter to be determined in discovery. Merely creating a toxic work environment in which misconduct could occur is sufficient for a negligent supervision claim. It was apparent from prior depositions that some Northwell staff had received no training on essential topics, and others claimed to have been trained but their behavior indicated otherwise.

193.    I previously documented Mr. Dowling's direct involvement with this matter (see *Andersen v. BA*, ¶81). He assigned his former underboss, Mitchell Shuwall, Associate Executive Director of Quality Management, to investigate, but the latter sent me a letter which turned a blind eye to the violations (id., Exhibit A page 9).

194.    Northwell has a history of misrepresenting the facts in my litigation against it. For example, I deposed Joseph Schulman, a senior executive at Northwell, in 2017. He is now a Senior Vice President, who "leads the Enterprise Data and Information Intelligence team, which is responsible for delivering inspiring, powerful and actionable insights through data that drive the highest degree of patient/provider connectedness, coordination and efficiency throughout Northwell's care delivery system." **In EBTs, I asked him whether Northwell complied with data breach notification laws, and he said yes** (see excerpt in Exhibit 8; full version docketed in Nassau case, doc. #355, p. 82). That was untrue at that time because Northwell's lawyers had already splashed my Private Information across the court dockets without notice, and he knew or should have known that sharing my records with PJ&A violated Northwell's data security policy.

His answer is still false now because the PJ&A Data Breach Notice was issued late, and Northwell did not issue any such notice. (NB: Mr. Schulman also claimed not to know about the Brady Law's blacklisting implications.)

195.    The extensive use of gamesmanship by Northwell should also be considered supervisory negligence, due to the fact that mental healthcare is a regulated profession, not a playing field for a sport played by providers against their patients, and the supervisors knew this practice was occurring but did nothing to stop it. The fact that my records remained on the Defendants' servers for longer than the maximum ten years is yet another example of Northwell's bullying, harassment and gamesmanship (see *Andersen v. BA,* ¶80, 132-135, 253, 425). This was like leaving my private medical records exposed on a table in the staff cafeteria for a decade, after I had already complained that they contained both private and false information. It was almost as bad as Northwell's act of creating the fraudulent medical records in the first place. An organization's tendency to show deliberate indifference to harassment by its staff is indicative of negligent supervision.

196.    Northwell blew smoke over the scene by refusing to produce organizational charts and job descriptions. Deponents verbally obscured the company's organizational structure, making it appear like a sky full of jet contrails, full of criss-crossing lines.

197.    As a direct and proximate result of Defendants' negligent hiring, retention and supervision, I have a current and ongoing substantial risk of identity theft.

### FOURTH CAUSE OF ACTION:

### DEFAMATION PER SE

198.    I hereby repeat and reallege paragraphs "1" through "197" herein, as if each has been fully set forth at length. (See also *Andersen v. BA,* amended complaint, ¶459 et. seq.)

199.    To establish defamation *per se*, four elements are generally required: (1) a false statement purporting to be fact concerning another person or entity; (2) publication or communication of that statement to a third person without privilege or authorization; (3) fault on the part of the person making the statement amounting to intent or at least negligence; and (4) some harm caused to the person or entity who is the subject of the statement.

200.    My defamation *per se* claim is within the statute of limitations in both NY and NC of one year, since the Data Breach occurred less than one year ago, was discovered ten months ago, and was reported to victims including me only four months ago.

201.    Its transfer of my data from its servers to PJ&A meets the legal definition of "publishing", which is "the act of placing or making available the presentation or information within the framework of a media venue so that it is accessible by the end users, consumers, viewers, or buyers." *Function Media, L.L.C. v. Google, Inc.*, 07-CV-279. (E.D. Tex. Oct. 9, 2009). PJ&A might not have intentionally made my data public, but intent is not part of the legal definition of publishing. Northwell did intend to make my Private Information public, as discussed *supra*.

202.    In an "actual malice" case, a plaintiff must prove even more: the defendant either *knew* that the statement was false at the time, or else demonstrated "reckless disregard" as to its falsity. To help demonstrate reckless disregard, plaintiffs can show that defendants were aware of facts that show they simply did not care about the truth of the statement in question. That includes evidence that defendants relied on sources they knew to be unreliable or had an ulterior motive for publishing the statement.

203.    In addition to Private Information about my family and me, as discussed in the foregoing, there were many false and defamatory statements about us in the medical records. *Inter alia*, Northwell invented symptoms for me, and stated that I had a history of a serious medical condition that I did not have: bipolar disorder. It also falsely accused me in the medical records of

having an affair.  It created a fictionalized account of events, to retroactively attempt to justify its illegal decision to detain me.

204.    As I explained in *Andersen v. BA*, Northwell's attorneys created the medical records including many false statements, without giving me the opportunity to make corrections, after I had pointed out that the statements were false. The legal definition of "loathsome disease" for the purposes of defamation *per se* includes mental illness, such as the bogus Bipolar Disorder diagnosis that Northwell pinned on me.

205.    I do not have Bipolar Disorder; in fact, I suffer from depression and PTSD. I have an affidavit from a physician – which will be filed with a Rule 20(a) motion for joinder – stating that I do not have Bipolar Disorder, and I never have had this illness.  Northwell did not do any objective testing to arrive at its phony bipolar diagnosis, and it did not inform me of it while I was in the hospital. Although types of objective testing exist, staff explained in EBTs their subjective methods which only involved chatting with the patient.

206.    I have never been adjudicated as or even accused of mental incompetence, although adjectives like "delusional" carry an implication of incompetency.  To some amateurs, Bipolar Disorder entails dangerousness, due to mass media accounts of violent incidents by individuals known to have this illness.  Northwell, however, has refused in bad faith to correct its records, although I asked it to do so.  This was like bullies spray-painting the walls of the schoolyard with lies about their victim, then making her do all the work to scrub off the paint.  In the absence of objective testing, the labels that Northwell applied to me in the medical records – such as "delusional", "manic", and "paranoid" – amounted to hate speech, and were no more scientific than slurs like "window-licker", "nutcase", or "lunatic".  A layperson might assume the worst on reading such pseudo-scientific, sensationalist adjectives applied to me, and mistakenly draw the conclusion that I was a dangerous individual – instead of my ex-husband, who actually was.  If I

should have been labeled in any way at the hospital, it was: "Fragile. Handle with care."  Among much other disinformation, Northwell stated in the medical records that I had taken my 7-year-old son with me to JFK airport on June 12th, 2011, and made it sound like I had stormed the aircraft gates with a battering ram, when in reality I had been alone and only peacefully tried to buy a ticket from the British Airways counter.  Northwell's staff and lawyers played fast and loose with unsubstantiated, emotionally charged words and exclamation points in lieu of evidence.  They weaponized every informational nugget that the hospital staff had gathered under false pretenses, invented some more, and used them all to discredit and embarrass my family and me.

207.    Northwell's lawyers blew my family's ancient relationship with the CIA out of proportion, misquoting me as saying I was an Agency employee.  There was a misleading implication between the lines that the venue for the action was improper (i.e. that I should have gone to the FISA court).  I do not believe this to be true, but the CIA refused to provide me with information, and it would be currently impossible for me to go to the FISA court anyway because I do not have an attorney.  I cannot be both "not out" of the Agency and "not in" at the same time, like Schrödinger's cat; that would completely deprive me of due process.  Since Judge Anthony Parga did not dismiss my medical malpractice case (see Nassau case, doc. #27), apparently it was previously decided that I was sufficiently "not in", so this Court should consider itself empowered to rule on the instant case.  The deceptive, unflattering caricature of me which Northwell hung on the courthouse walls looks like an unhinged version of Valerie Plame.  This reinforced its agenda of marginalizing me, and undermining my credibility.

208.    Another criterion of defamation *per se* is a false inference that someone is unchaste, such as Dr. Hanna's inaccurate accusation in the Northwell records that I had been having an extramarital affair with a government official in the UK, which the attorneys placed on the docket with no corrections.  This information was disseminated to their conspirators.  But actual

broadcasting of the information is not required; simply documenting it and leaving it in a place that is accessible to others – as HPMB and PJ&A did – meets the standard for defamation. Even if this allegation had been true – which it wasn't – I was legally separated from my husband, so I was free to have a new relationship. Northwell apparently thinks it is the romance and travel police.

209.    I attempted to correct Northwell's false statements administratively and in previous litigation. The company's privacy policy requires it to make corrections, but it failed to do so voluntarily, and the courts failed to order it to do so. The policy said that patients have the right to "ask us to restrict or limit the protected health information we use and share about you", but Northwell also declined to do that. So, Northwell's use of false statements was very deliberate.

210.    Northwell defamed me for one or more of several reasons:

(a) To retroactively try to establish a bogus case for its having detained me, and thereby undermine my credibility.

(b) To punish me for demonstrating that its decisions were wrong, and for my criticism of its staff, lawyers, business associates, and other allies such as Judge Leonard Steinman of NYS Supreme Court of Nassau. Judge Steinman was supported in his campaign for the bench by his Northwell cronies, including US Congressman Tom Suozzi (see recusal motion and motion to reargue in *Andersen v. North Shore Long Island Jewish Health System (NSLIJ) et. al,* index no. 602687/2015, docs. 433-450, 472-482). (NB: Suozzi was recently reelected in the congressional district where George Santos held office.)

(c) To punish me for reaching out to other patients who were abused by Northwell and other New York psychiatric hospitals, via my 2014 campaign on radio station *1010 WINS* and in the *Village Voice*. I formed a nonprofit company, supplemented the campaign with

an informational website, and collected information on approximately 100 victims. After several years, I had to discontinue this work due to lack of funding and available time.

(d) A combination of schadenfreude, lechery, cowardice, envy, callousness, or the other common human vices.

(e) As a form of gamesmanship. My Northwell experience has had nothing to do with healthcare or justice; it was a warped simulation in which everyone around me was doing the most inappropriate thing possible. The conduct of John Allen and "Alex" were striking examples. Northwell's attorneys used gamesmanship extensively, especially in 2017-2018 depositions in the Nassau case – where they took advantage of my *pro se* status to break every rule in the book (*Andersen v. BA*, ¶128 et. seq.)

(f) As retaliation on behalf of my business competitors who are Northwell's associates (NB: Northwell doctors receive financial compensation and benefits in kind – e.g. expert-led forums, meals, gifts, travel benefits – from the pharmaceutical and medical technology industries, see id., ¶268-272). Northwell's negative comments about me in the medical records were nothing more than astroturfing sponsored by my business competitors and Northwell's political allies.

(g) Retaliation due to my US Tax Court whistleblower case (no. 26195-16W) from 2009 to 2019 (*Andersen v. BA*, ¶267). After Northwell doxed me on the Nassau docket, the Internal Revenue Service submitted a motion – in a rare showing of human decency, pursuant to my prompting to its counsel – for a protective order over discovery materials in a confidential whistleblower case that was referenced in the deposition transcript. This pressured Judge Steinman to seal the transcript. If the Tax Court case were unsealed, a major motive for the bullying could be revealed.

(h) Other potential retaliation motives on behalf of the other conspirators, such as on behalf of British Airways and/or the UK Border Force for my criticism of their refusal to sell me an airline ticket at JFK airport on June 12, 2011 (id., ¶38 et. seq.)

(i) As punishment due to Northwell's erroneous professed assumption that I was employed by the Central Intelligence Agency (id., ¶245-248).

(j) As a hate crime act, punishable under 18 U.S.C. §249, due to one or more of my demographic characteristics – a white, female, Christian, politically conservative, British-American, civilian, disabled, divorced, heterosexual, educated, late-middle-aged, suburban, size 6, mother, who is a *pro se* litigant. Northwell is a politically liberal company founded under Jewish auspices, led almost entirely by male Democrats, which is located in the shadow of the Statue of Liberty. Ironically, holocaust remembrance days around the world were designed to remind people of what happens when hatred goes unchecked. Among Northwell and its supporters, hate and paranoia run amok, and the company practices nearly every type of discrimination. The more time passes, the less sincere any eventual apologies from Northwell and its cronies would seem.

(k) As retribution based on a false notion that I might have had something to do with the Jeffrey Epstein matter because I visited the Duke of York's office in London shortly after leaving the Northwell hospital, before the Epstein news was released in the media. I knew no more about the Epstein matter then than the general public did, and still don't. I did not go there as a sex trafficker, an investigator or a whistleblower. The fact that I was invited to the private corridors of Buckingham Palace only a week after being tortured in Northwell's psych ward was an embarrassment to the company, because it showed that I was not as barking mad as Northwell would have the public believe. This building's security is on a par with the Prime Minister's residence at Number 10 Downing St., so if I

had any history of dangerousness I would not have been invited.  I was treated cordially at the palace, where a colleague and I met with the Duke's Private Secretary at the time, Alastair Watson, about a potential charitable endeavor, and I was invited back for a second visit a few weeks later.  (After that, the Epstein furor continued, and Mr. Watson retired, so my project was shelved.)  The office was run professionally and non-ostentatiously, and I did not see any evidence of sex trafficking or any other misconduct.  If anyone were looking for proof that the world has turned upside down, here it is: Northwell, the ostensible embodiment of *tzedakah*, gave me the most uncharitable and ruthless reception imaginable, while the British Royal household – despite its reputation for exclusivity if not also snobbery – was charitable, empathetic and polite.  The only thing that would make this situation stranger is if Northwell were revealed to have been providing an overly aggressive "dry cleaning" service for the British government.   In an example of her pattern of politically-motivated prosecutions, it is notable how forcefully NYSAG Letitia James prosecuted the Duke of York, while remaining silent about my ex-husband's arguably more serious crimes. It is plausible that Ms. James the trophy hunter has put so much effort into smearing and obstructing me in order to besmirch the Royal Family by association.  On my own, I was not a politically significant target.

211.    So, to sum up, several potential motives for the Defendants' misconduct existed, but these would not have justified defaming me, nor would they have warranted the use of any information the Defendants extracted from me through coercion, violence, drugging and sexual abuse in boot camp conditions.

212.    In addition to filing the medical records pertaining to me on several court dockets, Northwell electronically delivered the records – which necessarily included its staff's false

statements – to its business associates PJ&A and MRO.  This met the definition of publication or communication of a false statement to a third person without authorization.

213.    Hypocritically, Mr. Dowling acknowledged in his 2018 book the deleterious effects of "the stigma surrounding mental health conditions"[17].  He also discusses the stigma of depression on his own website, *michael-dowling.com*[18].  Meanwhile, his lawyers have been busily defaming me in court since 2012, and his company was sharing false statements about me with its business associates such as PJ&A and MRO. And recently, Northwell's Corporate Compliance department has non-compliantly defamed me to the NC Attorney General's office, as discussed *supra*.

214.    These Defendants have damaged my public image through their character assassination campaign.  This has made it difficult for me to be taken seriously by lawyers, judges, regulators, and politicians, resulting in an unconscionable delay in seeing justice served.   Due to that delay, the numbers of recipients of my records took a quantum leap in 2023, with the revelation of the Data Breach and PJ&A's involvement.

215.    The PJ&A class action attorneys likely omitted defamation from their causes of action because not all of the class plaintiffs have noted false information in their medical records.

216.    I am entitled to injunctive relief as enumerated *supra,* with the addition of removal or retraction of all false statements pertaining to me, to the extent possible, performed by an unbiased, reputable professional.  (NB: If a terrorist blew a hole in your roof with a bomb, you would want a professional roofer to fix it, not an unrepentant terrorist.)  I ask that this Court order Defendants, their lawyers and their business associates to refrain from continuing to defame me.

---

[17] "*Health Care Reboot: Megatrends Energizing American Medicine*", Michael Dowling and Charles Kenney, Forbes Books, November 2018, page 112.
[18] https://www.michael-dowling.com/its-time-to-remove-the-stigma-behind-postpartum-depression/

## FIFTH CAUSE OF ACTION:

## BREACH OF IMPLIED CONTRACT

217.    I repeat and re-allege each and every allegation set forth in paragraphs 1 to 216 in the complaint as if fully set forth herein.

218.    I entrusted my Private Information to Defendants, albeit in the adversarial context of an involuntary hospitalization. In so doing, I entered into implied contracts with Defendants by which Defendants agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and accurately notify me if my data had been breached and compromised or stolen.

219.    An implied contract must contain the following elements: an offer, an acceptance of the offer, mutual agreement, and consideration. The "offer" in this case pertained to maintaining my records in a secure manner on the Defendants' computer systems. I was coerced into accepting their offer because I was an involuntary patient, and could not leave the hospital. There was no "mutual agreement", because I was not given any choice about being hospitalized, providing my Private Information, or anything else. It is difficult to say what the consideration was – since the contract was very involuntary – but I did not refuse to give information while I was in the hospital because it was better to give it than to have further torment inflicted on me by hospital staff. The implied contract started when the records were created, but it apparently was perpetual, since my records were kept for 2-1/2 years beyond the maximum ten years on Northwell's system, and are still there. It had no escape clause either, because I asked Northwell repeatedly for the records to be removed from the system, but they were not deleted or sealed. Without mutuality, consideration, an end date or escape clause, this was by definition an illegal contract.

220.    In its Privacy Policy, Defendant Northwell represented that it would not disclose my Private Information to unauthorized third parties. Defendant Northwell's website states: "We

Page 73 of 115

employ commercially reasonable measures to safeguard the collection, transmission and storage of the information we collect. These measures vary based on the sensitivity of the information that we collect, process and store and the current state of technology. We use software programs to monitor traffic to identify unauthorized attempts to upload or change information or other types of malicious use. Information collected from these sources may be used to help identify an individual in the event of a criminal investigation or as required by any legal process."[19]

221.    Defendant PJ&A's website states: "PJ&A recognizes the importance of information security. Comprehensive policies and procedures are used to ensure that all access to patient data is restricted. HIPAA compliance requires an enterprise to implement, maintain and review a variety of controls. The PJ&A platform enables HIPAA compliance through advanced technology for dictation, transcription and patient data accessibility."[20]

222.    When I provided my Private Information to Defendants in exchange for Defendants' services, they entered into implied contracts with me pursuant to which Defendants agreed to reasonably protect such information and to destroy any Private Information that they were no longer required to maintain. Defendants solicited, offered, and invited me to provide my Private Information as part of their regular business practices.

223.    Although I was hospitalized involuntarily, Northwell accepted my Private Information anyway, thereby committing itself to protect such information. In accepting and sharing my Private Information with each other, Defendants understood that they were required to reasonably safeguard the Private Information from unauthorized access or disclosure.

---

[19] https://www.northwell.edu/privacy-policies-disclaimers
[20] https://www.pjats.com/hipaa-compliancy/

224.    In entering into such implied contracts, I reasonably believed and expected that Defendants' data security practices complied with relevant laws and regulations, including HIPAA, the FTC Act, and State laws, and were consistent with industry standards.

225.    Although the "financial agreement" (*supra*) with Northwell was fraudulent, during the time that I was hospitalized I did not see it. I had a reasonable belief and expectation that the company would use part of its earnings to practice adequate data security. At that time, I had not seen the content of the records because Northwell's staff refused to show them to me while I was in the hospital. Northwell failed to do so, and so did its business associate, PJ&A.

226.    I would not have entrusted my Private Information to Defendants in the absence of the implied contract to document only accurate information and to keep my information reasonably secure. I would sooner have gone on a hunger strike in the hospital and refused all medication, than give Northwell staff any of my Private Information, if I thought they would treat my privacy with utter contempt.

227.    I would not have entrusted my Private Information to Defendants in the absence of its implied promise to monitor its computer systems and networks to ensure that it adopted reasonable data security measures. Defendants breached their implied contracts with me by failing to safeguard and protect my Private Information or to destroy it once it was no longer necessary to retain the Private Information.

228.    In *Andersen v. BA,* I pled fraud rather than breach of contract. The difference between the instant case and the former is that in *Andersen v. BA,* the intent to defraud was transparent (*Andersen v. BA*, ¶¶263, 445-447, 450-457). The medical records were created pursuant to an illegal involuntary hospitalization, based on information that Northwell gathered from me under the influence of false arrest, false imprisonment, forced drugging, threats, physical violence, deprivation of food and water, and other forms of extrajudicial punishment that together

met the United Nations' definition of torture. Unfortunately, that case was never heard; it was only made to disappear by magician-Judge Brown.

229.    In the instant case, PJ&A stated that the Data Breach was an accident – the company did not intend to leak anyone's medical records. It theoretically might have slipped the Defendants' collective minds that my medical records – which Northwell had fraudulently created based on both private and false information – were still roosting on their computer servers after 13 years, where the records were vulnerable to hackers. It is possible that Northwell never informed PJ&A that I was an involuntary patient and therefore had not signed an authorization form. Then what appears to be fraud might only be an egregious form of negligence for PJ&A. Some discovery will be required to reveal the amount of scienter necessary to prove fraud in PJ&A's case. I ask the Court in advance for permission to convert the implied breach of contract claim into a fraud claim if further information comes to light that sufficiently establishes scienter. (NB: this advanced level of lawyering is difficult for a *pro se* litigant.)

## SIXTH CAUSE OF ACTION:

### FRAUD

230.    I repeat and re-allege each and every allegation set forth in paragraphs 1 to 229 in the complaint as if fully set forth herein.

231.    The elements of a fraud claim are (a) the making of a statement, (b) the falsity of the statement, (c) an intent to deceive, called "scienter", or reckless disregard as to its truth or falsity, (d) reasonable reliance on the statement by the injured party and (e) injury sustained as the result of the reliance.

232.    Although PJ&A's misconduct may have been limited to breach of implied contract due to questions about its scienter (to be determined in discovery), Northwell's fraud was manifest,

given the degree of malice and/or cowardice that the company's staff and lawyers exhibited, and the degree to which my set of facts was already under the microscope due to my previous litigation. So, there should have been no doubt what my Private Information was, and that the company was obligated to protect it. Northwell staff and attorneys lied repeatedly, cheated in EBTs, and obstructed justice (see *Andersen v. BA*, ¶450 et. seq.). Even after I pointed out their malicious errors in pleadings, they failed to acknowledge or correct their mistakes. My judges believed the defense's lies instead of my truths, resulting in repeated dismissals and the loss of 13 years of my life. Now those lies may have been disseminated to exponentially more people, and likely sold on the dark web, due to the Data Breach.

233.    From Northwell's politically-motivated reasons for hospitalizing me (id., ¶80 and 240 et. seq.), to the transparently false statements that its staff made in my medical records resulting in UnitedHealthcare's approval of the fees for its so-called treatments (id., ¶96 et. seq., Exhibit A page 4-8), to their false statements in depositions and in pleadings (e.g. id., ¶¶131, 287, 446, 460-462), to Northwell's opaque sharing of my Private Information with third parties including PJ&A without my authorization, to its cursory "investigation" of my complaint which Mr. Dowling ordered his underling (former defendant) Mitchell Shuwall to execute (id., ¶81 and Exhibit A, page 9), to its false statements in court which it refused to correct even after confronted with the truth – Northwell's conduct has been copiously fraudulent and extremely damaging to me.

## SEVENTH CAUSE OF ACTION:

## BREACH OF FIDUCIARY DUTY

234.    I repeat and re-allege each and every allegation set forth in paragraphs 1 to 233 in the complaint as if fully set forth herein. (See also *Andersen v. BA*, amended complaint, ¶472 et. seq.)

235.    Typically, a claim for breach of fiduciary duty includes four elements: (a) the existence of a fiduciary duty; (b) a breach of that duty (through an act or omission); (c) damages; and (d) causation.  The statute of limitations in NC is three years.

236.    In light of the special relationship between Defendants and me whereby Defendants became guardians of my Private Information, Defendants became a fiduciary by their undertaking and guardianship of the Private Information, to act primarily for me, (a) for the safeguarding of my Private Information; (b) to timely notify me of a Data Breach and disclosure; and (c) to maintain complete and accurate records of what information (and where) Defendants did and do store.

237.    Defendants had a fiduciary duty to act for my benefit upon matters within the scope of Defendants' relationship with their patients, in particular, to keep secure my Private Information.

238.    Defendants breached their fiduciary duties to me by failing to safeguard my Private Information, failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period, and by failing to encrypt or otherwise protect the integrity of the systems containing my Private Information.

239.    The delay from May to November ensured that the Data Breach was announced after SCOTUS' decision not to hear my petition (filed April 24, 2023; denied Oct. 2nd), although it is possible that SCOTUS would have looked more favorably on my petition if it had known about the recurrent breach.  The delay also prevented me from filing a Rule 60(b) motion in the Second Circuit for *Andersen v. BA*, because this Rule precludes filing a motion more than one year after the court issued a decision.  This created significant additional delay and cost to me of filing an entire new action, rather than a motion.  The Defendants obstructed the view of decision-makers with deliberate, bad-faith delays.

Page 78 of 115

**EIGHTH CAUSE OF ACTION:**

**INVASION OF PRIVACY**

240.    I repeat and re-allege each and every allegation set forth in paragraphs 1 to 239 in the complaint as fully set forth herein.

241.    North Carolina recognizes the specific tort of invasion of privacy by intrusion into seclusion. This type of invasion of privacy includes the intentional intrusion into the seclusion or solitude of another person or their private affairs or concerns, where a reasonable person would find the intrusion highly offensive. The common law in NC defines invasion of privacy as actions taken without a person's consent or knowledge, with the intention of publishing or disclosing private information.   This would apply, since I was a resident of NC at the time of the Data Breach.

242.    NC has not yet recognized invasion of privacy torts for public disclosure of private facts, and NY does not recognize any common law claims for invasion of privacy. However, N.C.G.S. §15A-287 prohibits electronic surveillance, which Northwell does routinely and as a matter of policy, as discussed *supra*.

243.    As a result of Defendants' conduct, publicity was given to my Private Information, which included matters concerning my private life, due to the fact that the information pertained to a mental healthcare hospitalization pursuant to a marital breakdown.

**244.**    A reasonable person of ordinary sensibilities would consider the publication of my Private Information to be intrusive and offensive, especially given the sensitive nature of the narrative in the medical records.  My Private Information was not of legitimate public concern. For example, Northwell's discussion in the medical records of my financial, relationship and sexual matters was inappropriate, and should not have been plastered all over the court dockets or shared with PJ&A, or anyone else, without my authorization. This was so brazen that it could only have been deliberately designed to harass me.

## NINTH CAUSE OF ACTION:

## FRAUDULENT MISREPRESENTATION

245.   I repeat and re-allege each and every allegation set forth in paragraphs 1 to 244 in the complaint as fully set forth herein.

246.   Fraudulent misrepresentation occurs when a defendant makes an intentional or reckless misrepresentation of fact or opinion with the intention to coerce a party into action or inaction on the basis of that misrepresentation.

247.   To determine whether fraudulent misrepresentation occurred, six factors apply: (a) a representation was made, (b) the representation was false , (c) the defendant knew that the representation was false at the time or that the defendant made the statement recklessly without knowledge of its truth, (d) that the fraudulent misrepresentation was made with the intention that the plaintiff rely on it, (e) that the plaintiff did rely on the fraudulent misrepresentation, (f) that the plaintiff suffered harm as a result of the fraudulent misrepresentation.

248.   The most egregious of the fraudulent misrepresentations in this matter is Mr. Schulman's false statement, *supra*, that Northwell complied with data security laws.  If he had not done so, I would have done more extensive discovery on that topic than I did.

249.   The Northwell deponents who had flimsy stories are also noteworthy examples of fraudulent misrepresentation (see *Andersen v. BA*, ¶240 et. seq.)  They are relevant to the instant case because their names appear in the medical records, and they contributed to the records' content and dissemination.  For example, Abraham Lopez, a Filipino "nurse" who testified that he was working directly for the Federal government (the VA) when he assaulted and drugged me – a civilian – at Northwell, and that an "Agency" had sent him, but he implausibly couldn't remember Its name.  Gloves partially off, Lopez's federal employment automatically transformed the psychiatric hospital into an Federal pen… a Bic, so to speak.  And there was junior Dr. Lauren

Hanna, who was unlicensed to practice medicine at the time she wrote the records, who testified that she had a security clearance and was being paid by the government for her work at Northwell; she read from a "cheat sheet" in EBTs because she couldn't remember her cover story. And Dr. Mark Russ, who was in charge of the entire acute care service, who lied on a form stating that he had met with me in the hospital (id., ¶74), and who also intimated that he had a concealed role with the intelligence services by saying under oath that he could not remember whether he had a security clearance (id., ¶291). These impostors were a deepfake… the metaphorical equivalent of "ghost guns", designed to evade detection. They were as easily created as Dr. Hanna's cheat sheet. Dr. Russ was in charge of the whole shebang – albeit having fumbled his explanation under oath how he signed the forms with two different signatures that didn't match. Defense counsel David Rosen asked me about the Agency's role in this matter while deposing me, but I truncated my answer, apprehensively. I placed my cloisonné CIA "betting coin" – which I have had for years and literally don't remember how I got it – in the center of the table between us in the deposition room. Mr. Rosen picked it up and kNOCked on the table with the coin, twice. He did this while smiling excitedly, apparently thinking I would be pleased to discover that the source of my years of torment had been in my family's backyard at the Agency. It was like finding out that the masked thugs who beat me up in a dark alley were my own cousins. These individuals all grinned through EBTs as if tormenting a vulnerable, traumatized mother of a young child was the best entertainment they had had in years. Or maybe they were baring their teeth. It is disturbing that some of these bullies out of Central Casting were female. Is it any wonder that individuals such as these did not consider forging of documents and lying under oath to be big offenses?

250.     These examples go to the fraud, defamation, conspiracy and RICO claims because the authors of the leaked records were not who they appeared to be, and it opens up new questions about other undisclosed parties who may have improperly received the records. Apparently, either

the impostors' lawyers failed to explain the 5th Amendment to them, or they thought it was better to fabricate than to take the 5th. These individuals turned the aptly-named EBTs into a "snipe hunt" – a fool's errand, with Big Brother in charge, intended to make me fail at obtaining information that was deeply concealed. But it would have been pointless for me to fight to obtain more information from deponents in conflicted Judge Steinman's courtroom, where the answers to my requests were always negative.

251.    What limits are there on the conduct of such a defendant? This type of trickery is analogous to a "fork bomb" or "rabbit virus" (denial of service attack) in computing, wherein a process continually replicates itself to deplete available system resources, slowing down or crashing the system. I have never gotten a straight answer about whether I need to go to the FISA court or somewhere else to fully identify these impostors. (NB: Coincidentally, "Duke of York" is Cockney Rhyming Slang for "fork", and "fork" is a Cockney term for "fist". The expression "put up your dukes" reportedly originated here).

252.    The Court should have zero tolerance for this kind of fakery and concealment. As I explained in *Andersen v. BA* (¶295), the misleading, sarcastic responses I received from these impostors were analogous to permitting stage actors to appear in blackface. Such a monstrous act says to the world that a psychiatric patient's rights are not equivalent to a medical patient's rights, and that he or she belongs to an inferior class of persons that is worthy of ridicule. It is ableism, designed to prejudice a disabled person, waste her time, and undermine her arguments in court. I need to depose these individuals again, to discover the role of the government entities involved. It is plausible that Northwell was just a stalking horse for one or more government entities, which would be an alarming indictment of the current state of our personal freedoms as citizens. Northwell's organizational chart is impossibly complicated as it is, without the addition of unidentified third-party org charts tangled up in it. It is likely these impostors have been involved

in the care of other Data Breach victims too – at least Dr. Russ, due to his lofty title and long tenure in office.

253.    How can a plaintiff properly litigate a breach of fiduciary duty claim if there is more than one party that has a duty to the victim, but not all of them have been identified?  How can you fully litigate negligence, fraud, RICO or any of the other causes of action?  Due to the involvement of Mr. Lopez at minimum, Federal funds should be made available for restitution, and I want to find out how many other Federal operatives were involved in depriving me of my rights.  It could prevent me or other Data Breach plaintiffs from ever seeing justice served if the Court allowed Northwell to substitute more theatrical performances for testimony, to evade punishment.

254.    I am entitled to know whether the people who abused their power to detain and torture me were authorized to do that type of work legally in the US.  Northwell refused to provide me with this information in prior discovery.  Thousands of similarly situated Americans would be horrified if they found that the foreign individuals who locked them in a psych ward (the likes of Filipino Mr. Lopez and his Indian supervisor, former defendant Kompancaril) did not have the proper immigration status or English fluency to do their jobs (id., ¶430).  I contacted ICE about these individuals, but it failed to investigate.  Other countries must be laughing at Americans' willingness to allow foreigners to work here in our country, without apparent screening, and take jobs locking citizens up in hospitals on our own turf.  And the Brady Law allows such foreign workers to covertly confiscate those citizens' gun rights, permanently (¶258 et. seq.).

255.    These impostors were the "cat's paw", and I believe I am entitled to identify the cat that was attached to it, or to be told in no uncertain terms that I need to go to the FISA court for that information and be allowed an attorney to take me there.  If we pretended that the cat did not exist, I could still prevail based on the paw, but that would only be partial due process.  However,

having to bifurcate my case – one about the paw and one about the cat – would double the amount of litigation work, and be impossibly complicated for a *pro se* litigant.

256.    I ask this Court to ban such "masks" for these proceedings – the type of blackface mask that I have just described.  I refer to the type of cover stories that have been used to conceal true motives in my litigation, to stigmatize me, to waste my time, and to gain unfair advantage over me.

257.    The sheer size of this Data Breach signposts an even more massive fork bomb waiting to explode, if preventive measures are not quickly installed to prevent such a leak from happening again.  3.9m is already a huge number of plaintiffs for the justice system to process.

## TENTH CAUSE OF ACTION:

## UNJUST ENRICHMENT

258.    I repeat and re-allege each and every allegation set forth in paragraphs 1 to 257 in the complaint as if fully set forth herein.  (See also *Andersen v. BA*, ¶477 et. seq.)

259.    I conferred a monetary benefit on Defendants, by providing Defendants with my valuable Private Information, albeit involuntarily. Indeed, in acquiring the Private Information, Defendants were then able to charge fees for their services to UnitedHealth.

260.    Defendants enriched themselves by saving the costs they reasonably should have expended on data security measures to secure my Private Information, and these cost savings increased the profitability of the services. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendants instead avoided its data security obligations at my expense of by utilizing ineffective security measures. I suffered as a result of Defendants' failure to provide the requisite security.

261.    Under the principles of equity and good conscience, Defendants should not be permitted to retain the monetary value of the benefit belonging to me because Defendants failed to implement appropriate data security measures and breach notification according to industry standards.  Defendants acquired the monetary benefit, Private Information through inequitable means in that it failed to disclose the inadequacy of the security practices.

262.    Had I known that Defendants had not secured my Private Information, I would not have agreed to provide information to Defendants. I have no adequate remedy at law.  As a direct and proximate result of Defendants' unreasonable and inadequate data security practices, I have suffered and will continue to suffer other forms of harm.

## ELEVENTH CAUSE OF ACTION:

### PROMISSORY ESTOPPEL

263.    I repeat and re-allege each and every allegation in the paragraphs 1 to 262 of the complaint as if fully set forth herein.

264.    Within contract law, promissory estoppel refers to the doctrine that a party may recover on the basis of a promise made when the party's reliance on that promise was reasonable, and the party attempting to recover detrimentally relied on the promise.  An agreement made by promissory estoppel will typically have the same binding effects on parties that a valid contract would. If a party breaches an obligation created by promissory estoppel, a court can choose to assign either reliance damages or expectation damages.

265.    Defendant Northwell promises through its Privacy Policy to protect patients' Private Information. It was foreseeable that I would reasonably rely on Northwell's reputation as an established medical services provider, and my prior experience with the company.  To my substantial detriment, I did in fact rely on Northwell's reputation. Furthermore, if Northwell had

made it known to me that it would not have safeguarded my Private Information, I would not have given it any information at all.

## TWELFTH CAUSE OF ACTION:

## VIOLATION OF DECEPTIVE TRADE PRACTICES STATUTES

266.    I repeat and re-allege each and every allegation contained in paragraphs 1 to 265 the Complaint as if fully set forth herein.  (See also *Andersen v. BA*, amended complaint, ¶433 et. seq.)

267.    New York Deceptive Trade Practices Act, NY Gen. Bus. Law §349, prohibits deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in the state of NY. North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA", NC General Statutes Chapter 75), does the same for NC.

268.    By reason of the conduct alleged herein, Defendants engaged in unlawful practices within the meaning of the UDTPA and NYGBL §349. The conduct alleged herein is a "business practice" within the meaning of these laws, and the deception occurred in part within New York State, because Northwell is a New York company and I was resident in NY for 11 years since my hospitalization.  Since I relocated to NC in 2022, and the breach was discovered in 2023, the NC statute would also apply.

269.    Defendants entered into business agreements with health care providers to provide, among other things, medical transcription services.

270.    Defendants stored my Private Information in their electronic databases. Defendants knew or should have known they did not employ reasonable, industry standard security measures that complied with all relevant regulations and would have kept my Private Information secure and prevented the loss or misuse of that Private Information. I would not have provided my Private

Information, if I had been told or knew that Defendants failed to maintain sufficient security thereof, and their inability to safely store my Private Information.

271.    As alleged herein in this Complaint, Defendants engaged in unfair or deceptive acts or practices in the conduct of consumer transactions in violation of deceptive trade practice laws including but not limited to:

a) Representing that its services were of a particular standard or quality that it knew or should have known were of another;

b) Failing to implement and maintain reasonable security and privacy measures to protect my Private Information, which was a direct and proximate cause of the Data Breach;

c) Failing to identify foreseeable security and privacy risks, and remediate identified security and privacy risks, which was a direct and proximate cause of the Data Breach;

d) Failing to comply with common law and statutory duties pertaining to the security and privacy of my Private Information, including duties imposed by the FTCA, 15 U.S.C. §45, which was a direct and proximate cause of the Data Breach;

e) Misrepresenting that they would protect the privacy and confidentiality of my Private Information, including by implementing and maintaining reasonable security measures;

f) Omitting, suppressing and concealing the material fact that they did not reasonably or adequately secure my Private Information; and

g) Omitting, suppressing and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of my

Private Information, including duties imposed by the FTCA, 15 U.S.C. §45, which

was a direct and proximate cause of the Data Breach.

272.    Defendants' representations and omissions were material because they were likely

to deceive reasonable consumers about the adequacy of Defendants' data security and ability to

protect the confidentiality of consumers' Private Information.

273.    Such acts by Defendants were and are deceptive acts or practices which were and/or

are likely to mislead a reasonable consumer providing his or her Private Information to Defendant.

These deceptive acts and practices are material. The requests for and use of such Private

Information through deceptive means occurring were consumer-oriented acts and thereby fall

under the consumer fraud statutes NYGBL §349 and NC UDTPA.

274.    In addition, Defendant's failure to secure patients' Private Information violated the

FTCA and, therefore, violates NYGBL §349 and NC UDTPA. Defendants knew or should have

known that their computer systems and data security practices were inadequate to safeguard my

Private Information, deter hackers and detect a breach within a reasonable time, and that the risk

of a data breach was highly likely.  I accordingly seek all monetary and non-monetary relief

allowed by law, including actual damages, treble damages, injunctive relief, civil penalties and

attorneys' fees and costs.  The conduct violated NYGBL §349 and NC UDTPA, in that it is a

restraint on trade or commerce.

275.    Defendants' violations of NYGBL §349 and NC UDTPA have an impact and

general importance to the public, including the people of NY and NC. Millions of patients have

had their Private Information stored on Defendants' electronic databases, many of whom have been

impacted by the Data Breach.

276.    Taking documents from computers belonging to one organization and removing

them to another entity's servers (or personal servers) to try to escape the scope of discovery – is

deception reminiscent of the Hillary Clinton scandal. However, many documents in my litigation have mysteriously been reported as missing or inaccessible. So, it is likely that the Defendants and their conspirators have helped each other to cheat in this manner. Regulations require there to be complete alignment of policies and procedures between the double-dealing Defendants, but this seems unlikely given what they have already told me. This needs to be studied in discovery.

277.    The commercial transaction between Northwell and PJ&A is an illegal tying arrangement (see also id., ¶263). If one applied a Rule of Reason analysis, as USDOJ says "Although the elements of a *per se* tying violation have been articulated differently, courts generally require that: (1) two separate products or services are involved, (2) the sale or agreement to sell one is conditioned on the purchase of the other, (3) the seller has sufficient economic power in the market for the tying product to enable it to restrain trade in the market for the tied product, and (4) a not insubstantial amount of interstate commerce in the tied product is affected." I was billed by Northwell via UnitedHealth – both monopolistic players – to be treated against my will, at an unspecified dollar amount that was part of a usurious overall fee, with no notice, no informed consent, and for no valid reason, and all of this was documented by PJ&A behind my back. The menu of treatments that I was served at Northwell consisted of an only partially identifiable recipe, like Spam, with some mystery ingredients such as PJ&A and MRO.

278.    The US government sued Northwell's predecessor company in 1997 in an antitrust case under the Sherman and Clayton acts (*United States v. Long Island Jewish Medical Center,* 983 F. Supp. 121 (E.D.N.Y. 1997)). The court allowed the merger of Long Island Jewish Medical Center and North Shore Health System to go ahead, and the company took that as its cue to continue its anticompetitive tactics. Northwell has achieved a monopoly on Long Island in private inpatient mental healthcare, by breaking the rules. The court systems have perpetuated Northwell's monopoly through their deliberate indifference to my complaints.

279.    The bad-faith tactics which Northwell used on me in previous litigation (id., ¶¶236-238) could be viewed as deceptive trade practices. These included, *inter alia*, information chilling in EBTs (especially the frequent refusal to answer questions), declining to confer with me, withholding witnesses, misrepresenting the facts, misquoting the rules, submitting incomprehensible pleadings full of fallacies, failing to comply with Local Civil Rule 7.2. (Authorities to Be Provided to *Pro Se* Litigants), requesting unnecessary adjournments, refusing to provide discoverable documents, failing to return calls or answer correspondence, seeking unnecessary formal authorizations, conducting *ex parte* conversations with law clerks, cutting me out of scheduling decisions, pretending to serve documents that don't arrive, producing illegible, redacted, or unauthenticated documents, and other forms of discovery obstructionism. Every last document request that I made of these Defendants – whether administratively or through prior discovery – was either denied, or delivered in incomplete form.

280.    As a direct and proximate result of these deceptive trade practices, I am entitled to judgment under NYGBL §349 and NC UDTPA, to enjoin further violations, to recover actual damages, to recover the costs of this action (including reasonable attorneys' fees) and such other relief as the Court deems just and proper.

281.    Defendants' implied and express representations that they would adequately safeguard my Private Information constitute representations as to the particular standard, quality or grade of services that such services did not actually have (as the services were of another, inferior quality), in violation of NYGBL §349 and NC UDTPA.

## THIRTEENTH CAUSE OF ACTION:

## NEGLIGENT OR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

282.    I repeat and re-allege each and every allegation in paragraphs 1 to 281 of the complaint as if fully set forth herein. (See also *Andersen v. BA*, amended complaint, ¶481 et. seq.)

283.    The tort of intentional infliction of emotional distress (IIED) occurs when one acts abominably with intent to cause another to suffer severe emotional distress, such as issuing the threat of future harm. In a *prima facie* IIED case, there are four elements: the defendant acts, his conduct is outrageous, he acts for the purpose of causing the victim emotional distress so severe that it could be expected to adversely affect mental health, and the defendant's conduct causes such distress.

284.    *Andersen v. BA* discussed my shock, terror and humiliation of being falsely imprisoned and exploited by Northwell. I have had to revisit this feeling repeatedly over the past decade thanks to the Defendants, e.g. when discovering my medical records published on two different dockets, when seeing the Defendants' fabrications about me in print or hearing their fiction in depositions, when experiencing flagrant discriminatory obstruction such as the NYSAG's, and when reading judges' dismissal orders based on the Defendants' untruths. I am exhausted from 13 years of this "night of the long knives", which has now exceeded a whopping 20% of my life.

285.    The publishing of my medical records and confidential transcript on the court dockets by Northwell's attorneys – was unconscionable; it was designed to cause me distress because (a) they did not notify me in advance, (b) my repeated anguished complaints to and about these lawyers show that they did indeed cause me distress, and (c) they refused to take any corrective action. Whether the PJ&A spillage of my Private Information was negligent or intentional is to be established in discovery.

286.    I have not received any assurances that my medical records have been removed from Northwell's or PJ&A's computer networks, although I have asked repeatedly through the courts for orders to eliminate those records. I ask the Court to order the Defendants to remove my medical records from their IT systems permanently.

287.    I wanted to forget the ghastly experiences inflicted on me by my adversaries, but instead I have had to remember my suffering and write about it repeatedly for 13 years, like a macabre version of *Groundhog Day*. The deliberately delayed resolution of this matter – and the ballooning number of people I have had to get involved to seek resolution – is in and of itself evidence of IIED.

288.    Northwell has a history of using its involuntary psychiatric hospitalization powers for the purposes of politically-motivated retaliation (see *Sullivan v. North Shore Manhasset Hospital,* index no. 601819/2015, and id., ¶213).

289.    New York's "Clean Slate Law" was recently signed by Governor Kathy Hochul. The law seals criminal records for most offenders in hopes that, by doing so, people will more easily shake any stigma associated with their criminal convictions. So now, convicted criminals in New York State have greater privacy rights than hospital patients do. This is just one example of the variety of ways that New York treats people with mental health conditions like second class citizens.

290.    Absent judicial relief, Defendants will continue to violate my rights, and I will suffer imminent and irreparable harms.

## FOURTEENTH CAUSE OF ACTION:

## STATE MENTAL HYGIENE LAWS

291.    I hereby repeat and reallege paragraphs "1" through "290" herein, as if each has been fully set forth at length.

292.    Confidentiality of mental health records is within the remit of 10A NC Administrative Code 26B, which has similar provisions to New York Mental Hygiene Law (NYMHL) §33.13.  It is likely that the NYMHL and HIPAA were the primary privacy statutes applicable to my records from 2011-2022, since I was resident in NY.  The NC law and HIPAA might apply to use of the records in recent years.  Some discovery will be necessary to determine where the records have resided, while in the custody of Northwell, PJ&A, and their conspirators.

293.    NYMHL Article 9 and §33.13 protect the privacy of mental healthcare patients' privileged records, in their entirety, in New York.  §33.13 specifically states that clinical records may only be released "with the consent of the patient or client or of someone authorized to act on the patient's or client's behalf, to persons and entities who have a demonstrable need for such information and who have obtained such consent, provided that disclosure will not reasonably be expected to be detrimental to the patient, client or another... Additionally, information so exchanged shall be kept confidential and any limitations on the release of such information imposed on the party giving the information shall apply to the party receiving the information."  Such patient consent for release must be accompanied by a signed HIPAA authorization, such as *Andersen v. BA*'s Exhibit K.

294.    Northwell sent me a subset of my records with a cover letter, dated September 22nd, 2011, stating that the records are confidential and protected by NYMHL §33.13.  Because the Defendants did not obtain my consent before releasing my records to third parties, they violated §33.13.  It was foreseeable that the content of the records would be "reasonably be expected to be

detrimental to the patient", given the defamatory statements and exceedingly private revelations that Northwell staff had made therein.

295.    Northwell did not have a HIPAA authorization from me to release my records to PJ&A, MRO or any other third party.  It nevertheless sent my records to PJ&A, MRO, Carolyn Wolf P.C. (who is a private sector attorney I have never known), the NYC Department of Health and Mental Hygiene Assisted Outpatient Treatment Program (in 2017) which had nothing to do with me since I did not live in the City, the NYS Office of NICS Appeals and Safe Act (in 2019) which is part of OMH, among others, without notice to me, in violation of §33.13 and HIPAA.  I received these documents from MRO on March 19th, 2024, after I told Mr. Sandhusen that I objected to the involvement of an intermediary.  He only provided a subset of the 2011 records that I received in prior discovery, plus a handful of extra pages.

296.    Note that the NY SAFE Act gun control law was not passed until 2013, so it is unlikely that the State had jurisdiction to request my 2011 records from Northwell eight years later, in November 2019.  This is an example of NY's gun control zeal run amok.  The letter coincided with *Sullivan* – my Queens court proceeding against OMH – so it is possible that this was a retaliatory tactic.  Furthermore, the letter was stamped "received" by Ciox, which meant another third party that was not authorized by me was involved.  The letter cited 14 NYCRR 543, which says "Section 7.09 of the Mental Hygiene Law authorizes the Office of Mental Health to collect, retain, modify or transmit data or records for inclusion in the NICS system".  So, its intent was evidently to put my records in the FBI's NICS database – behind my back, and without due process, despite the fact that I am not and have never been violent in my life, or posed any kind of weapons risk.  This example shows why all NY gun owners should think seriously about leaving this paranoid, hostile State, as I have.  There was no information provided with the letter about which records Northwell actually sent in response.  I need to explore this in discovery.

297.    The **only** place Northwell had my authorization to place my medical records was the docket of the Queens County courthouse, as it was required by NYMHL §9.39 and 9.27 to do, however, it failed in its duty to file my records there.  After struggling for five years through *Sullivan* and *Pheffer*, I finally obtained a certificate from the Queens County Chief Clerk, dated February 28th, 2024 (Exhibit 9), showing that the requisite paperwork had not been filed with that court.  If I had had this certificate while I was still litigating the Nassau case, it could have been the clincher for my false imprisonment and NYMHL claims.  This was more evidence of a cover-up.

298.    In mid-March 2024, Northwell sent me an important and incriminating letter (also in Exhibit 9) dated June 29th 2011, from Renee Lifshitz (deceased in 2020) its former paralegal ("Medical-Legal Coordinator"), stating that she did send the records to the Queens court requesting a hearing under §9.31, but without specifying which records were included with it.  The letter conflicts with the certificate that the Queens Clerk sent me.  If Ms. Lifshitz did in fact send this letter, it was done in a tardy manner; the statutory deadline for me to have a hearing was five days after I requested it on June 12th, 2011.  The issuance of this letter and ensuring that I had a timely hearing were Dr. Kane's responsibilities as Chairman of Psychiatry at the time (id., Nassau case ¶224, and *Andersen v. BA's* Exhibit A page 8, and ¶73), so this also supports my negligent supervision, deceptive trade practices and fraud claims.

299.    This letter is further evidence that Northwell only follows regulations sporadically, and often only after having its arm twisted.  Ms. Lifshitz was reportedly 84 years old when she wrote this letter, yet she was still working in a key position at Northwell in her dotage, fossilizing patients' records.  Why she was still there is a good question since retirement age at Northwell for administrative jobs is usually 65.  Statute required that the letter be copied to me when it was

written on June 29th, 2011, if it in fact existed at that time, but I didn't receive it, and it should have been produced in discovery in May 2017, but it wasn't.

300.    This was a very serious omission – the worst type of discovery whitewashing. Either Northwell has been covering up the letter for 13 years, or it was created after the fact as a smokescreen. The discovery process in the instant case could reveal the truth. The company waited until after Ms. Lifshitz died to release this letter to me, plausibly because they did not want me to depose her, since that would likely have made it harder for Judge Steinman to dismiss the Nassau case. Disgraceful.

**301.    I am entitled to know whether the Defendants negligently or deliberately shared my records with a hacker in 2023, after going to great lengths to avoid sharing them with me, because this would make their misconduct even more egregious. This statement applies to nearly all of my causes of action.**

## FIFTEENTH CAUSE OF ACTION:

## HUMAN RIGHTS LAWS

302.    I hereby repeat and reallege paragraphs "1" through "300" herein, as if each has been fully set forth at length.

303.    The Defendants are (or operate) places of public accommodation as defined in Title II of the Civil Rights Act of 1964, section 201(a). It should be clear from the foregoing that Defendants' conduct was intentionally discriminatory; it was not merely disparate impact. This was evident in their refusals to make reasonable accommodations – even when such accommodations would be easy for them to implement – or to discuss any forms of compromise.

304.    Northwell states publicly that it "complies with applicable Federal civil rights laws and does not discriminate on the basis of the individual's age, race, creed/religion, color, national

origin, alienage or citizenship status, sexual orientation, military or veteran status, sex/gender, gender identity, gender expression, disability, genetic predisposition or carrier status, marital status, partnership status, and victim of domestic violence, or any other protected status". This is even more broadly worded than any of the human rights laws I am invoking here.

305.    The class action attorneys have used the NYS Human Rights Law (Executive Law §296), which has a subset of the inclusions in the above statement. It is relatively comprehensive, encompassing "race, creed, color, national origin, sexual orientation, gender identity or expression, military status, sex, disability or marital status." I can use this, but it omits religion and marital status from my list. However, the violations in the instant case involve three states and transmissions between them – New York, Nevada and North Carolina – in addition to reports made to regulators in Washington. So, I am offering this as a blended claim as a matter of pragmatism, to save space.

306.    Northwell cultivates its image as a company that practices fairness and equality.[21] However, my experience has shown this is a smokescreen. I experienced discrimination and bias-motivated hostility from Northwell due to my gender, age, race, religion, citizenship, disability, genetics, political affiliation, marital and parental status, socioeconomic status, body habitus, and status as a victim of domestic abuse. Other plaintiffs have sued Northwell for various forms of discrimination (e.g. see *Andersen v. BA*, ¶214 et. seq., and *Lee Ann Hutchison v. Northwell*, 23-cv-02116, EDNY). Northwell has a history of gender discrimination in employment also (see *Ekholm v. NSLIJ*, 06-cv-02080, EDNY).

307.    Northwell's omissions from the records were as important as its false statements, such as the formal complaints that I made while I was still in the hospital about being assaulted,

---

[21] https://www.northwell.edu/privacy-policies-disclaimers/notice-non-discrimination-and-accessibility

battered, stripped and drugged by bias-motivated gangs of staff, one of which was all black, and both of which included men (see Nassau case, ¶¶4, 83-133). These attacks were shockingly devoid of human decency, aggravated by the fact that I am only 5'2", was 116 lbs at the time, was suffering from depression, and recovering from spine surgery. Regulations and policies required such written complaints to be included in the records, but they were not. Northwell had an Occurrences and Patient Complaints policy at the time, and its Code of Ethical Conduct also required such reporting. The omission of my complaints about serious incidents from the records was another attempt by Northwell to minimize and marginalize me, and to make its conduct appear less serious than it actually was.

308. As a woman, a mother of two minors, a domestic abuse victim, a Christian, and a mental healthcare patient, I had legitimate special needs for protection of my Private Information, as discussed *supra*. Decisions about when and how to share sensitive information with children usually falls to mothers rather than fathers, so this is a gender issue as well. However, in a throwback to the pre-women's-liberation era, Northwell used sexualized violence against me – a rape survivor and recent victim of domestic violence – to extract Private Information by coercion and physical force, and used it to create their medical records. The means of creation of the records is relevant to the instant case because in the absence of coercion I would not have given Northwell any Private Information. The information was used to intentionally embarrass and defame me in a gendered manner. It also violated my protected status as a victim of domestic abuse. Obviously, Northwell and PJ&A do not treat all of their customers so abysmally, otherwise they would be out of business; this was discriminatory abuse.

309. The patriarchy is thriving at Northwell. It is common for sweatshop operators like Northwell and its conspirators to exploit female, disabled and child laborers. These lowly workers are traditionally kept locked away from public view, while the sweatshops place men at the front

of the house. Northwell's senior management team was predominantly white and male in 2011, and still is.

310.    The various human rights statutes to which I have referred are generally less inclusive than New York's §296. Nevada's (NRS 651.070) includes "race, color, religion, national origin, disability, sexual orientation, sex, or gender identity or expression." North Carolina's equivalent statute for disability is §168A-6, discrimination in public accommodations. NC does not have a statewide public accommodation law for nondisabled individuals; this is handled on a county-by-county basis.

311.    The Federal statute – Title II of the Civil Rights Act of 1964 – only includes race, color, religion and national origin, programs and activities receiving federal financial assistance. Northwell receives abundant federal funding as discussed *supra*; it is a matter for discovery to determine whether PJ&A does also. Religion and national origin are relevant to my claims, however gender is also very important, as is disability and victimhood, so I need the state statutes as well.

312.    Under the NYS Human Rights Law, places of public accommodation are prohibited from publishing any written materials that would indicate a denial of privileges based on the characteristics listed. Northwell's publishing of my Private Information on multiple court dockets is an example. Nevada enacted Assembly Bill 207 into law in 2021, extending the state's public accommodations laws to protect online services.

### SIXTEENTH CAUSE OF ACTION:

### TITLE III OF THE AMERICANS WITH DISABILITIES ACT (ADA)

313.    I hereby repeat and reallege paragraphs "1" through "311" herein, as if each has been fully set forth at length. (See also *Andersen v. BA*, amended complaint, ¶382 et. seq.)

314.    Title III of the ADA states, pertaining to private sector entities: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." This includes preventing individuals with disabilities from fully and equally enjoying services through policies, practices, and procedures.

315.    Defendants discriminated against me, in violation of Title III of the ADA not only as part of a general pattern of discrimination against patients with mental health conditions, involuntarily hospitalized patients, and patients who are disabled, but also individually.

316.    To state a valid claim under Title III of the ADA, a plaintiff must allege (1) that she is disabled within the meaning of the ADA; (2) that Defendants own, lease, or operate a place of public accommodation; and (3) that Defendants discriminated against her by denying her a full and equal opportunity to enjoy the services the Defendants provide.

317.    The Defendants qualify as places of public accommodation for the purposes of Title III of the ADA. They are open to the public, they usually provide their services for financial remuneration, and they operate under rules and regulations issued by State and Federal government.

318.    A person is considered a "qualified individual" with a disability under the ADA if that individual (1) has "a physical or mental impairment that substantially limits one or more of the major life activities of such individual;" (2) has "a record of such an impairment;" or (3) is a person "regarded as having such an impairment." 42 U.S.C. §12102(2). Impairments that limit major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working... other examples of major life

activities include mental and emotional processes such as thinking, concentrating, and interacting with others... and major bodily functions (e.g., functions of the digestive system and bowel).

319.    I am considered disabled under the ADA and Rehabilitation Acts. This was discussed in my previous EDNY, Nassau and Queens cases, and the Magistrate in my EDNY case against Northwell, Judge E. Thomas Boyle, stated that I met the ADA standard of disability.

320.    Further, GINA (the Genetic Information Nondiscrimination Act of 2008) protects people with genetic illnesses from discriminatory treatment. This includes the gastrointestinal condition that resulted in the surgery to remove my colon.  There is increasing evidence that psychiatric illnesses such as the depressive illness from which I suffer are genetic in nature. This indicates that the tendency to blame a psychiatric patient for his own condition is based on faulty assumptions, and that the real culpability for his behavior may be in his own DNA. It is no different to discriminate against someone with a gene for a psychiatric illness than it is to discriminate against an individual with a gene that causes his dark skin, or his homosexuality, or a hereditary form of cancer.

321.    I have not alleged that the Defendants rendered me disabled, only that their conduct made me suffer more than I might otherwise have, due to my preexisting disabilities. Furthermore, psychiatric disabilities are just as valid under the ADA as physical ones. It is no different for a business to discriminate under the ADA by e.g. failing to provide a wheelchair ramp than it is by failing to prohibit broadcasting of private medical records. It is a reasonable accommodation for any hospital to avoid disseminating a patient's private, confidential medical records without so much as giving the individual a chance to comment. That is especially true when it knows that person suffers from PTSD and would benefit from being able to put the incidents that led to her condition behind her and get on with her life.  It is a reasonable accommodation to avoid further subjecting a PTSD sufferer to traumatic experiences. These are not merely reasonable

accommodations, they are common sense – things that anyone with a modicum of human decency would do. Unfortunately, human decency is badly lacking in the Defendants. By failing to provide reasonable accommodations, Defendants have failed to provide equal access to their services, in violation of Title III of the ADA.

322.    Because of my disabilities I am not likely to "fully and equally" share in the "enjoyment" (borrowing the language of the statute) of the Defendants' medical records dissemination services ... not to the extent that – for example – a litigant with no serious medical problems, or who is devoid of personal matters that he considers confidential, might benefit from these same services.

323.    Northwell operates on the basis of a caste system, where there is one set of rules for medical patients, and another, harsher set, for psychiatric patients. PJ&A also participates by association. Within the psychiatry caste system is a caste subsystem, where there is an authoritarian set of rules for involuntary patients, and a relatively fair and lenient set for voluntary patients. Medical patients and voluntary psychiatric patients are never kidnapped, handcuffed, assaulted, stripped, involuntarily drugged, or robbed of their vehicles and other belongings. However, involuntary psychiatric patients often are. The Defendants need to explain how they justify these contradictions in the 21st century world of quality assurance systems. This degrading caste system is unsustainable, but it is enabled by Northwell's corporate imperialism and the deliberate indifference of regulators and law enforcement. Psychiatric patients – and particularly involuntary ones – are not granted the same rights as voluntary or medical patients, by hospitals, law enforcement or regulators, despite the fact that involuntary patients are usually the more vulnerable ones. The Defendants' reckless conduct adds to the impression that they as a ruling class think that patients are too *meshugeneh* or worthless to deserve basic services like data security, or breach notification within statutory deadlines. It is discriminatory and offensive.

324.    The class action attorneys omitted the ADA and the Rehabilitation Act from their causes of action because not all of their plaintiffs are disabled. However, disability is an important characteristic that adds value to my case. The court system should give more assistance to disabled plaintiffs than others, because such litigants are more likely on average to have difficulty than non-disabled ones. However, in the past 12-1/2 years of my struggle in both State and Federal courts, it has become brutally apparent that the court systems themselves have been making it more difficult for me to obtain access to justice, not less so. In addition to the bias against *pro se* litigants, this is because the court systems have failed to uphold the ADA.

325.    Because Title III is silent on the statute of limitations period for private rights of action, Federal courts, when applying the ADA, apply the most analogous state statute of limitations. This would likely be two years under Chapter 168A of the NC Persons With Disabilities Protection Act. Since the Data Breach occurred within the past year but was not reported until November 2023, this does not pose a problem.


### SEVENTEENTH CAUSE OF ACTION:

### SECTION 504 OF THE REHABILITATION ACT OF 1973

326.    I hereby repeat and reallege paragraphs "1" through "324" herein, as if each has been fully set forth at length. (See also *Andersen v. BA*, amended complaint, ¶398 et. seq.)

327.    The same arguments that apply to the ADA also apply to Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. §794(a) and (b)(1)(B)). To address these elements in order: (a) my qualifying disability has already been established, (b) I was qualified for benefits of service as a patient, and (c) I was denied the benefits of service, because as a disabled litigant I could not benefit from whatever Defendants aimed to achieve through the "services" of sharing my Private

Information with each other, failing to have adequate data security measures in place to prevent data breaches, and failing to report the Data Breach in a timely manner.

328.    Oblivious to the idea that there should be boundaries between government and healthcare, Senators Kirsten Gillibrand and Chuck Schumer, Former US Congressman Pete King, and other New York politicians have helped Northwell to attract so much money – literally **billions** of dollars in TARP and other Federal funding – that it might as well be a branch of the Federal government.  For example, in 2011, while Northwell was illegally surveilling me and splashing the product of its surveillance all over its computer networks behind my back, US Senator Gillibrand gave it $500k to develop its IT system. While Northwell was lying about its policies and breaking every quality rule in the book, HHS was rewarding the company with $3.7m in Federal funding for its quality system. While it was forcing me to take unapproved drug cocktails that had not undergone scientific research, Northwell was taking $40 million in National Institutes of Health (NIH) grants for research. Northwell's pattern of Federal funding spans many years, including the intervening decade while it was lying about me in court, and allowing 3.9m individuals' data to fall into the hands of hackers.  A particularly large example was $795 million Northwell received in Federal hotspot funding for COVID.  These politicians collected a fortune for NY State's richest company while that criminal enterprise was abusing some of the State's most disabled and disadvantaged citizens.  Sen. Schumer apparently hasn't had time to help the 3.9m victims, most of whom are his constituents, perhaps because he has been too busy lately trying to run Israel.

## EIGHTEENTH CAUSE OF ACTION:

## TRAFFICKING VICTIMS PROTECTION ACT OF 2003 ("TVPA")

329.    I hereby repeat and reallege paragraphs "1" through "327" herein, as if each has been fully set forth at length.  (See also *Andersen v. BA*, amended complaint, ¶358 et. seq.)

330.    This claim is timely filed pursuant to 18 USC §1595 of the TVPA. The statute of limitations for a civil trafficking case under 18 U.S.C. §1595(1) is ten years. The underlying trafficking by Northwell began in June 2011 (id., ¶¶358-365), but I did not learn of the Data Breach until November 2023.  PJ&A also participated in the trafficking, via its contract to provide services related to my medical records, to Northwell.

331.    Mr. Dowling has built Northwell to its gigantic proportions in part by trafficking involuntary mental healthcare patients like me, like a dairy farmer who secretly traps and sells endangered species on the side. He sanitizes this traffic by declaring it to the IRS as charitable activities.

332.    18 USC §1589(a), which pertains to forced labor, provides a means of punishment for "Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means: (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person; (2) by means of serious harm or threats of serious harm to that person or another person; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint."  18 USC §1589(b) extends to "Whoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means

described in subsection (a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means".

333.    Northwell obtained my Private Information by confining me in a locked ward, making threats of harm if I did not comply with the staff's wishes, causing actual harm by forcibly restraining and drugging me, allowing other patients to threaten me with physical violence, and documenting egregiously false information in my records. I did not sign any release that would have allowed Northwell to traffic me in any way, or to share my Private Information with other parties such as PJ&A.  However, it posted my Private Information on several court dockets between 2012 and 2019, and then in November to December 2023 I discovered it had also shared the information with PJ&A and MRO.

334.    The term "abuse or threatened abuse of law or legal process" is defined broadly in 22 U.S.C. §7102 as "the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action." This applies to Northwell (id., ¶¶99, 287).

335.    The Defendants participated in a profitable forced labor scheme that coerced me to perform work for them on an uncompensated basis, by providing them with Private Information that they took in bad faith and misused.  Northwell was effectively a recruitment agency for PJ&A, and the two companies collaborated in the collection of my Private Information, which they utilized to produce the fraudulent records and save them in a noncompliant manner on their computer servers. The forced labor has continued for 13 years, but I only discovered PJ&A's role in it when I received the Data Breach Notice in November 2023. This work has been compulsory, because if I failed to continue this fight, I would have no hope of ever having the records deleted from the Defendants' servers.

336.    The Court should also recognize that the Defendants committed retaliation, intimidation, hostile work environment, and unequal pay, in violation of Title VII of the Civil Rights Act, and NY and NC equal employment practices statutes. Since I was subjected to forced labor, I was to all intents and purposes an employee of the Defendant organizations – albeit an unpaid one. However, I was subjected to degrading, inhumane, obstructive, harassing treatment, and segregated due to my disability, while Defendants' other employees were not. It is typical for human traffickers to keep their employees hidden away from public view, and gagged by various means. That is what these slave-masters did to me.

337.    Not only did Northwell traffic my private life, but it also published what amounts to trauma pornography – with me as the unwilling porn star. The hospital stripped, drugged and bullied me into submission, which enabled it to create and publicly distribute explicit adult material in its medical records. Additionally, Northwell's policies astonishingly permit it to package and offer its patients' medical records for sale without the patients' consent, although it does not state publicly what information it sells, and my deponents claimed not to know. I became an involuntary "strawberry" – a woman who trades sex for drugs… in this case, both involuntarily (id., ¶186). In addition to that, I was actually billed for this so-called treatment, which in the context of medical records looked more like revenge porn than healthcare. It was aggravated by the fact that I had just left my husband, who was engaging in vice and exposing my youngster to porn, when this happened. (As Mr. Dowling said in Becker's on December 29th, 2023, "It's no secret that Americans are increasingly being exposed to rising levels of rudeness, hostility, a lack of civility and decency in our day-to-day lives.")

338.    Northwell's deal with Epic[23] to use its Electronic Health Record (EHR) software will enable Northwell's patient records to be included in Epic's Cosmos data lake (https://cosmos.epic.com).    Cosmos is a massive database of ostensibly de-identified patient records that Epic offers for sale.    However, the devil is in the details of such data transfers, and this process requires a consent form from the patient.    Previous deponents feigned ignorance about Northwell's sale of patient data, and this is a subject for discovery.    I do not believe it is possible for every mental healthcare patient's Private Information to legally be pushed off the dock into said "lake".    It is unlikely that involuntary patients would agree to it, if asked.    If I had any spare time, I would form a union to represent these patients/workers, who are the most mistreated minority in the country.

339.    The PJ&A class action attorneys likely omitted the TVPA from their causes of action because it would only apply to plaintiffs who were hospitalized involuntarily, and therefore likely failed to sign releases allowing their data to be shared with Northwell's business associates. Those patients have probably not yet realized that their situation is different from the other class members, and their claims are likely more valuable.

## NINETEENTH CAUSE OF ACTION:

## CONSPIRACY

340.    I hereby repeat and reallege paragraphs "1" through "338" herein, as if each has been fully set forth at length.    (See also *Andersen v. BA*, amended complaint, ¶367 et. seq.)

341.    The essential elements of a 42 U.S.C. §1985 Conspiracy claim are: (a) a conspiracy; (b) to deprive plaintiff of equal protection or equal privileges and immunities; (c) an act in

---

[23] https://www.northwell.edu/news/the-latest/northwell-selects-next-generation-electronic-health-record

furtherance of the conspiracy; and (d) an injury or deprivation resulting therefrom. In *Andersen v. BA*, I explained how Northwell and the other defendants worked together either actively or through deliberate indifference to deprive me of my rights. In the instant case, a new conspirator has been added in the form of PJ&A.

342.    The second clause of 42 U.S. Code §1985 pertains to "Obstructing justice; intimidating party, witness, or juror". I have referred in the foregoing repeatedly to the manner in which the Northwell has conspired with other organizations to obstruct justice, thereby preventing justice from prevailing. For example, Defendants' delayed failure to disclose information about the Data Breach, providing incomplete records, and ongoing restriction of access to information as described in the foregoing, amounts to obstruction of justice.

343.    The third clause of 42 U.S. Code §1985 pertains to "Depriving persons of rights or privileges", starting out with the wording: "If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws..." The "disguise" element is relevant here, as discussed in *Andersen v. BA* (¶369 et. seq.). The use of false identities, hidden employers, and undisclosed third parties such as PJ&A fits the legal definition of "disguise", which means the act of misleading another through intentionally false statements or fraudulent actions. This is the Defendants' *modus operandi*. Northwell's undisclosed sharing of my records with PJ&A – and refusal to identify its members of staff or contractors in discovery – qualifies as disguise. (See Fraudulent Misrepresentation, *supra*). I was unable to obtain several of the Northwell deponents' CVs in prior discovery, and received none of their IDs, job descriptions, human resource dept. files, or anything else that one typically expects to obtain in discovery. Judge Steinman did not cooperate because he was protecting Northwell, his political campaign sponsor.

344.    The SOL for conspiracy begins on the date of the last overt act, but the overt acts in furtherance of the conspiracy are still ongoing.    My records remain on the Defendants' computers, and they continue to harass me and obstruct justice.

345.    The PJ&A class action attorneys omitted conspiracy from their causes of action. However, they do not seem to have done as much research as I did on the links between the two companies and their individual employees.    Additionally, these attorneys almost certainly could not claim that all of their clients were involuntary patients.

### TWENTIETH CAUSE OF ACTION:

### CIVIL RICO

346.    I hereby repeat and reallege paragraphs "1" through "344" herein, as if each has been fully set forth at length.

347.    To establish a substantive RICO violation, a plaintiff must show a "pattern of racketeering activity," 18 U.S.C. §1962(a)-(c), and to establish a RICO conspiracy, a plaintiff must show a conspiracy to commit a substantive RICO violation, *id.* § 1962(d). Thus, "[u]nder any prong of §1962, a plaintiff in a civil RICO suit must establish a 'pattern of racketeering activity.'"

348.    RICO defines "pattern of racketeering activity" as requiring "at least two acts of racketeering activity" committed in a 10-year period (18 U.S.C. § 1961(5)). To establish a pattern, a plaintiff must also make a showing that the predicate acts of racketeering activity by a defendant are "related, *and* that they amount to or pose a threat of continued criminal activity." *See H.J., Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). The Defendants constitute an "association-in-fact" for the purposes of RICO; to perceive it, one only needs to follow the chain of custody of my person and my Private Information, from the airport to the hospitals to PJ&A.  The continuity of the acts in this case is open-ended, since as I have shown

above, they have every indication of continuing into the future in the absence of intervention by this Court. The acts are ongoing, interrelated, and current because (*inter alia*) there has been no representation made that my Northwell account has been closed, information requests remain chilled, and my Private Information remains on the court dockets and in the hands of hackers who obtained it in the Data Breach. The fact that the Defendants have made no attempt to rectify the situation implies a threat of further violation, because their defenses remain inadequate. Every time, for example, another individual accesses my Private Information in an unauthorized manner, or I am denied access to privileged documents, or another Defendant misrepresents the facts, or another defense attorney lies in court or pays to file fraudulent documents, then another racketeering act occurs. My loss of employment opportunities – in addition to actual monetary losses – due to the Defendants' racketeering was an injury to "business or property" within the meaning of RICO. It should be clear from the foregoing that the acts by Defendants are related, and they connect with the criminal racketeering enterprise that I described in *Andersen v. BA.*

349.     Obstruction of justice has been rampant in the Northwell-PJ&A criminal enterprise, and this offense alone would be sufficient for civil RICO.

350.     Because Northwell is located in NY, and PJ&A is in Nevada, the wire transfers that were likely made to move funds and pay PJ&A for its services – which are the product of money laundering – have been interstate, and electronic communications have also been interstate. This can be confirmed in discovery.

351.     "Where the enterprise primarily conducts a legitimate business, there must be some evidence from which it may be inferred that the predicate acts were the regular way of operating that business, or that the nature of the predicate acts themselves implies a threat of continued criminal activity." *COFACREDIT, SA v. Windsor Plumbing Supply Co.*, 187 F. 3d 229 (1999). It has been apparent from my discussion with the Defendants' and their conspirators' staff that they

believed (or, purported to believe) this was a normal way to operate their business, even when I pointed out how their conduct deviated from their policies and from law (e.g. see the transcripts of the previously mentioned "Alex" call, the John Allen meeting, and the Schulman EBT transcript). Northwell staff claimed to think it was perfectly OK to falsify financial agreements such as the ones in *Andersen v. BA*'s Exhibit A. (NB: Discovery should reveal who was responsible for the creation of those fraudulent documents; I was unable to find out despite dozens of hours of depositions.)

352.    Although the rampant obstruction of justice – 18 U.S.C. § 1503 – by the Defendants would be enough to satisfy the requirements for civil RICO, the additional Section 1961 predicate acts in this case include *inter alia* 18 U.S.C. § 1341 and 1343 (mail and wire fraud), 18 U.S.C. § 1644 (credit card fraud), 18 U.S.C. § 880 (receiving proceeds of extortion), 18 U.S.C. § 1344 (bank fraud), 18 U.S.C. § 1589 (forced labor), 18 U.S.C. § 1956 (money laundering), 18 U.S.C. § 2511 (wiretapping), 18 U.S.C. § 1512-1513 (witness/victim tampering and retaliation), 18 U.S.C. § 2422 (coercion and enticement), 18 U.S.C. § 1466 (engaging in the business of selling or transferring obscene matter), 21 USC § 848 (Continuing Criminal Enterprise - "Drug Kingpin Statute"), 18 U.S.C. §1001 (False Statements Act), 18 U.S.C. § 1005 and § 1006 (false entries), (18 U.S.C. § 1519 (Federal Falsification of Business Records), 18 U.S.C. § 2 (Aiding and Abetting), 42 U.S.C. § 1320d–6 (Wrongful disclosure of individually identifiable health information), 42 U.S.C. § 1320a–7a (penalties for disclosing Social Security numbers), and 18 U.S. Code § 249 (hate crime acts). In addition, there have been many NY penal code violations including *inter alia* public corruption, false arrest, kidnapping, false imprisonment, battery, grand larceny, reckless child endangerment, criminal possession of stolen property, and drug offenses.

353.    The acts began in 2011 and have continued to the present day, so they are within the SOL for civil RICO.

## **VII. PRAYER FOR RELIEF**

354.    As a direct and proximate result of Defendants' Negligence, Negligence *per se,* Negligent hiring, retention and supervision, Defamation *per se,* Breach of implied contract, Breach of Fiduciary duty, Fraud, Invasion of Privacy, Fraudulent Misrepresentation, Unjust enrichment, Promissory Estoppel, Deceptive trade practices, Negligent or Intentional Infliction of Emotional Distress, State Human Rights Laws, Title III of the ADA, the Rehabilitation Act, Trafficking Victims Protection Act, Conspiracy, and Civil RICO, I sustained compensatory damages as enumerated in ¶181, above.  I am entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach, and injunctive relief as enumerated in ¶182, above.

WHEREFORE, I request judgment against Defendants and that the Court grant the following:

A.    Compensatory and punitive damages to be determined at trial,

B.    Declaratory and injunctive relief, to avert the likelihood that illegal acts of the nature described in the foregoing will continue to be committed by the Defendants.  I also ask the Court to order the Defendants to provide me with a final, itemized statement of account, delete my medical and financial records from their servers after providing a complete set to me including quality assurance records, close my account, and never again to (i) detain or hospitalize me against my will, (ii) force any services on me. (iii) bill for services not requested, (iv) confiscate my belongings, (v) require me to give them Private Information, (vi) share or sell my Private Information or any other information pertaining to me, (vii) deploy individuals with false identities to interact with me, (viii) surveil my family or me, (ix) engage in defamation, extrajudicial punishment or spoliation of evidence, (x) discriminate against me, or (xi) violate my privacy.

C.      Assessment of civil penalties for "Tier 4" HIPAA violations which involved willful neglect of HIPAA rules and no effort made to correct the violation within 30 days of discovery (42 USC §1320d-5, 42 USC §1320d-6). The offenses were committed under false pretenses, with the intent to sell, transfer or use individually identifiable health information for commercial advantage, personal gain or malicious harm, permitting fines of $250,000 and imprisonment up to ten years.

D.      Assignment of an unconflicted, authentic law firm with appropriate values to convert this case to a class action, to represent me as well as the Data Breach victims who have special circumstances like mine, as discussed *supra*. Award attorney's fees pursuant to 42 U.S.C. §1988 and other costs associated with the disbursement of this action, plus interest.

E.      Such other and further relief as this Court may deem just and proper.


If the Court considers this complaint to be excessively long, I ask in advance to replead. I have done my best to abbreviate it, by leaving the government conspirators (such as OMH and the NYSAG) out of the causes of action, and referring to previous pleadings rather than restating information where possible. I also ask that if the Court sees fit to dismiss any cause of action, to please explain why it did so, with specificity.

No previous application for the relief herein prayed has been made, other than as described in the foregoing.

## VII. DEMAND FOR JURY TRIAL

I hereby request a trial by jury of any issue so triable as of right pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

Dated: March 24ᵗʰ, 2024

Greensboro, N.C.

Respectfully submitted,

Lauren Andersen
4214 West Wendover Ave., #1316
Greensboro, NC 27407
(516) 725-4411
lauren.andersen@proton.me